**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

WHEELABRATOR BALTIMORE, L.P.
1801 Annapolis Rd
Baltimore, MD 21230,

CURTIS BAY ENERGY, L.P.
1501 South Clinton Street, Suite 130
Baltimore, MD 21224,

ENERGY RECOVERY COUNCIL          Civil Action No. 1:19-cv-01264
220 Wilson Boulevard
Suite 310
Arlington, VA 22201,

NATIONAL WASTE & RECYCLING
ASSOCIATION
1550 Crystal Drive
Suite 804
Arlington, VA 22202,

and

TMS HAULING, LLC
6106 Twilight Court
Baltimore, MD 21206,

            *Plaintiffs*,

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE
Baltimore City Hall
100 North Holliday Street
Room 250
Baltimore, MD 21202

            *Defendant.*

---

**COMPLAINT**

Plaintiffs Wheelabrator Baltimore, L.P. ("Wheelabrator Baltimore") Curtis Bay Energy, L.P. ("Curtis Bay"), the Energy Recovery Council, the National Waste & Recycling Association ("NWRA"), and TMS Hauling, LLC ("TMS Hauling"), bring this action for declaratory judgment, preliminary and permanent injunctive relief, and damages and attorney fees against the Mayor and City Council of Baltimore ("City" or "Defendant"), through undersigned counsel and allege as follows:

## INTRODUCTION

1.    This Complaint seeks to invalidate an illegal effort by the City to force the Wheelabrator Baltimore waste-to-energy facility and the Curtis Bay Baltimore Regional Medical Waste Incinerator, a hospital/medical/infectious waste incineration ("HMIWI") facility (each a "Facility" and collectively, the "Facilities") to shut down by imposing extraordinarily low emission limits and other mandates that the City has no authority to require. On February 11, 2019, the Baltimore City Council passed Ordinance 18-0306, known as the Baltimore Clean Air Act, which Mayor Catherine Pugh then signed into law on March 7, 2019. *See* Exhibit A, City Council Bill 18-0306, enacted and codified as Balt. City Health Code §8-110, *et seq.* (hereinafter, the "Act" or "Baltimore Clean Air Act"). This Act is the first effort by the City to regulate air emissions that have been subject to federal and state air quality management under the federal Clean Air Act ("CAA") for fifty years. The Act is not a good faith effort to regulate air emissions. Rather, it is a targeted attempt to shut down two specific facilities, ignoring all other stationary and mobile sources of air emissions in the City. Baltimore City Councilman Edward Reisinger, who sponsored the Act, stated that it is specifically intended to "shut down Wheelabrator" and declared that

"[Wheelabrator]'s got to be closed."[1] The Baltimore Clean Air Act directly conflicts with the stringent existing air emissions control requirements the Facilities are currently satisfying under the federal CAA and Maryland air laws and regulations as overseen by the U.S. Environmental Protection Agency ("EPA") and the Maryland Department of Environment ("MDE"). The Act also directly conflicts with Maryland's Solid Waste Management Act by forcing the Facilities to either heavily modify their physical plants and pollution control devices which were reviewed and approved by MDE, or shut down, in effect nullifying the Refuse Disposal Permits ("RDP") issued to each Facility by MDE.

2.      The Act imposes extraordinary and unprecedented constraints that do not advance public health, are not science- or fact-based, and in fact are in furtherance of an agenda to close the Facilities regardless of the consequences to residents and businesses in Baltimore City and beyond. The City acknowledges that the Act will at a minimum require the Wheelabrator Facility to close for some indeterminate period of time, and perhaps forever. The Act will also cause the Curtis Bay Facility to shut down at least temporarily to install unnecessary and financially burdensome equipment upgrades. This would harm the environment by restricting safe disposal capacity and impose enormous and unfair costs on the Facility Plaintiffs and more importantly, the City's and surrounding jurisdictions' residents and businesses. It also will divert over a hundred thousand tons per year of municipal solid waste to landfills in violation of the City's Solid Waste Management Plan ("SWMP"), adding many millions of dollars of additional costs on City residents and increasing air pollution associated with diesel trucks transporting waste to landfills

---

[1] Peter O'Dowd, *Baltimore's Burning Question: What To Do With Its Trash Incinerator*, (Apr. 25, 2019) https://www.wbur.org/hereandnow/2019/04/25/baltimore-waste-incinerator-garbage.

and from decomposition of the waste in the landfill, instead of producing electricity and steam through combustion.

3.      For decades, waste-to-energy facilities such as Wheelabrator Baltimore and HMIWI facilities such as the Curtis Bay Facility have been subject to comprehensive air regulations under federal and Maryland air laws that preempt conflicting local mandates like the Act. In the 1990 CAA amendments, Congress required EPA and Maryland to promulgate a continuing series of more stringent air pollution regulations related to both waste-to-energy and HMIWI facilities, which both EPA and Maryland did. Wheelabrator Baltimore and Curtis Bay have continually met those respective requirements. These air pollution laws and regulations, adopted only after EPA and MDE considered thousands of pages of detailed comments from the public, and after voluminous scientific and technical review, are protective of the public health by a significant and scientifically established margin of safety.

4.      The City introduced and passed the Baltimore Clean Air Act on a rushed schedule without the technical and scientific evaluation that is a hallmark of air regulations promulgated by MDE and EPA under the CAA. The bill was drafted by a third-party activist who has declared his intent to close Wheelabrator Baltimore and Curtis Bay. It was introduced in the City Council on November 19, 2018, discussed at one public hearing on January 30, 2019, passed by the City Council at two consecutive meetings on February 4th and 11th, 2019, and then signed by Mayor Pugh on March 7, 2019.

5.      The Baltimore Clean Air Act imposes air emission limits that are far more stringent than those required by the existing comprehensive federal and Maryland state air laws. Indeed, the limits for the Wheelabrator Baltimore Facility are lower than those applicable for any permit for any waste-to-energy facility in the United States. The Act also imposes burdensome and

technically infeasible continuous emissions monitoring obligations and daily reporting requirements of air emission constituents, despite the fact that EPA-approved methods for direct monitoring of many of these constituents do not exist. The Facilities already employ continuous emissions monitoring systems ("CEMS") for key pollutants for which CEMS are available and technologically appropriate. Finally, the Act imposes strict liability criminal penalties for any violation of its requirements. This is a major departure from the federal CAA and MDE air laws, which only provide for such penalties in cases of knowing violations of requirements. *See* 42 U.S. Code § 7413(c); Md. Code Ann., Envir. § 2-609.1.

6.      Both federal and Maryland law, as well as the Charter of Baltimore City, prohibit local laws like the Baltimore Clean Air Act that conflict with or obstruct state and federal laws, regulations, and permits. Likewise, Maryland law has long barred local law on subjects that the State is actively and comprehensively regulating and where there is a need for uniformity and expertise, like air pollution control and solid waste management. The Act is preempted because it seeks to enter a field of regulations thoroughly occupied by both the federal and state government as administered by EPA and MDE, and essentially nullifies the Facilities' Title V operating permits, which have been issued pursuant to federal and state law. In addition, the Act – supported by no legislative fact-finding and the thinnest of records – targets Wheelabrator Baltimore and Curtis Bay with the intent of driving them from business in an arbitrary and capricious manner and in a remarkable display of legislative hubris.

7.      Both Wheelabrator Baltimore and Curtis Bay's operations are governed by numerous state solid waste laws and regulations. Maryland law comprehensively legislates the field of solid waste management, setting forth the requirements for municipal waste combustor

permitting, managing the treatment and disposal of solid and medical waste,[2] and mandating the creation of and requirements for the SWMP that the City must submit for approval. The Act interferes with the state solid waste management framework. The Act also interferes with the Northeast Maryland Waste Disposal Authority's (the "Regional Disposal Authority" or "Authority") governance over regional solid waste management solutions for the Baltimore Metropolitan Region.

8.      According to its state-approved SWMP applicable for the years 2013 through 2023, the City disposes of the majority of its residential and commercial waste at the Wheelabrator Baltimore Facility. Each day, Wheelabrator Baltimore processes an average of 2,100 tons of waste from Baltimore City and surrounding counties, making the Facility critical to the City's residents and businesses and the City and state's overall solid waste management scheme. The City's SWMP also relies on Curtis Bay. The SWMP projects that 10,818 tons of medical waste will be produced within Baltimore City in 2019 and 11,257 tons a year by 2023, a substantial portion of which must be disposed at the Curtis Bay Facility. If the City succeeds in shutting down Wheelabrator Baltimore and Curtis Bay under the guise of regulating air emissions, it will effectively revoke MDE's decision to permit the Facilities and impermissibly amend the City's SWMP (and those of nearby counties) without MDE approval.  Although the City represented to MDE that the Facilities are necessary for successful implementation of the SWMP, it is now legislatively forcing their closure under the pretext of regulating air emissions through the Act.

---

[2] The terms "infectious waste," "medical waste," and "hospital, medical, and infectious waste" are variously used by the following statutes and their implementing regulations: the Federal Clean Air Act, 42 U.S.C. § 7401, *et seq.*; the Maryland Clean Air Act, Md. Code Ann. Envir. § 2-101, *et seq.*; and the Maryland Solid Waste Act, Md. Code Ann., Envir. § 9-101, *et seq.* As used herein, those terms are to be understood as synonymous. For the sake of simplicity, the term "medical waste" will be used throughout.

9.     The City does not possess the authority to enact the Baltimore Clean Air Act.  Under Md. Code Ann., Envir. § 2-104, a state political subdivision's only option for seeking emission standards more stringent than the federally approved state law, which is what the Baltimore Clean Air Act does, is to request MDE to adopt them.  Further, the Maryland Constitution and Charter of Baltimore City do not grant the City the authority to adopt a general law that has effects well beyond the City, as the Act does, and prohibit the City from passing laws that conflict with or are inconsistent with state laws.  Maryland has delegated to MDE the authority to regulate air emissions in the state, which it has done comprehensively.  The terms of the Act conflict with MDE's carefully crafted regulatory framework and impermissibly intrude on its authority.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (Section 1983 jurisdiction), and 28 U.S.C. § 2201 (declaratory judgment).

11.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from a common set of operative facts and are so related to the claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy.

12.     Venue is proper under 28 U.S.C. § 1391(b) because Defendant is located in the Northern Division of the District of Maryland and a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern Division of the District of Maryland.

## PARTIES

13.     Wheelabrator Baltimore operates the only waste-to-energy facility in the City. The facility is located at 1801 Annapolis Road, Baltimore, Maryland 21230, adjacent to the I-95 freeway in an area of the City zoned for heavy industry.

14.     Wheelabrator Baltimore is a Maryland limited partnership. Wheelabrator Baltimore operates its Facility pursuant to the terms of its federally authorized CAA Title V operating permit and its state-mandated Refuse Disposal Permit, both issued by MDE in accordance with applicable federal and Maryland air laws and regulations. Wheelabrator Baltimore is contractually obligated to accept municipal solid waste collected from City and surrounding counties' households, businesses, non-profits, and municipal buildings.

15.     Curtis Bay owns and operates the only existing HMIWI facility in the State of Maryland. The Facility is located at 3200 Hawkins Point Road, Baltimore, Maryland 21230, adjacent to the I-695 beltway opposite of Baltimore City's Quarantine Road Municipal Landfill, and in an area of the City zoned for heavy industry.

16.     Curtis Bay is a Maryland limited partnership. Curtis Bay operates its Facility pursuant to the terms of its federally authorized CAA Title V operating permit and its state-mandated Refuse Disposal Permit, both issued by MDE in accordance with applicable federal and Maryland air laws and regulations. Curtis Bay accepts and treats medical waste from area hospitals, doctors and dentists' offices, nursing homes, emergency responders, medical research facilities, veterinarians, pharmaceutical manufacturers, and other similar operations.

17.     TMS Hauling is a trash removal company in Baltimore City with four employees. TMS Hauling is a Maryland limited liability company, with its principal place of business at 6016 Twilight Court, Baltimore, Maryland 21206.   TMS Hauling removes municipal waste from

approximately 52 residential apartment complexes and 33 small businesses located within the City, disposing of the waste exclusively at the Wheelabrator Baltimore Facility. The Baltimore Clean Air Act and the closure of the Wheelabrator Baltimore Facility due to the passage of the Baltimore Clean Air Act would harm TMS Hauling.

18.     The Energy Recovery Council is a non-profit trade association that is incorporated and has its principal place of business in Virginia.  The Energy Recovery Council's purpose is to promote the waste-to-energy industry, as well as the interests of its members in administrative proceedings and litigation that may affect the industry.  Its members own and operate the large majority of modern waste-to-energy facilities in the United States and include several dozen business organizations in the municipal waste management and energy fields, including numerous municipalities that are served by waste-to-energy plants. Certain Energy Recovery Council members, including Wheelabrator Baltimore, will be harmed by the Baltimore Clean Air Act.

19.     The National Waste & Recycling Association ("NWRA") is a non-profit trade association that is incorporated in Illinois and has its principal place of business in Virginia.  NWRA represents the interests of for-profit waste and recycling companies in North America and provides leadership, advocacy, research, education, and safety expertise to promote the North American waste and recycling industries and their goals of providing safe, economically sustainable and environmentally sound services.  Certain NWRA members, including Wheelabrator Baltimore and Curtis Bay, will be harmed by the Baltimore Clean Air Act.

20.     The City is a municipality and corporation organized and existing under the laws of the State of Maryland and the Charter of Baltimore City. At all times relevant to this action, the City was and is responsible for enacting and enforcing the Baltimore Clean Air Act.

## STATEMENT OF FACTS

### A.  The City Lacks the Legal Authority to Regulate Air Emissions By and Through the Baltimore Clean Air Act

21.     The City's legal authority to regulate air emissions is limited by Maryland law. MDE is vested with "jurisdiction over emissions into the air and ambient air quality" and for "monitoring ambient air quality in this State." Md. Code Ann. Envir. § 2-103(b)(1)-(2). MDE "shall adopt rules and regulations that set emission standards and ambient air quality standards" for the state. Md. Code Ann. Envir. § 2-302(b). In Maryland, local government's role with respect to setting air emission and ambient air quality standards more restrictive than the standards set by MDE is limited to requesting that MDE adopt such standards for the locality.  Md. Code Ann. Envir. § 2-104(b). Unless MDE adopts a more restrictive standard due to such a local government request under § 2-104, MDE must set the emission standards "based on the goal of achieving emission levels that are not more restrictive than necessary to attain and maintain the national air quality standards." Md. Code Ann. Envir. § 2-302(d)(1)-(2). This is because MDE is required to set ambient air quality standards "that are identical to the standards for pollutants for which national primary or secondary ambient air quality standards have been set by the federal government." Md. Code Ann. Envir. § 2-302(c)(1).

22.     Maryland air laws prohibit the City from passing the Act, which purports to set emission standards more restrictive than the federal and state standards, rather than requesting MDE to adopt such standards. Moreover, the City lacks the scientific and technical staff, expertise, and funding of EPA and MDE to evaluate and set emission limits and air quality standards. The only technical evaluation contained in the Act's administrative record is the City's own observation that the Act will likely result in the diversion of thousands of tons of municipal waste from reduction and energy production at the Wheelabrator Baltimore Facility to regional landfills.

The City failed to evaluate whether the Act will benefit public health, and whether this diversion of waste will result in an overall degradation in air quality from increased vehicle emissions, landfill methane gas production, and increased energy demands from customers who directly rely on Wheelabrator's energy production. Nor did the City evaluate whatsoever the Act's potential impact on the health care, research, law enforcement, and manufacturing stakeholders who rely upon the Curtis Bay Facility for disposal services.

### B. The Wheelabrator Baltimore Waste-to-Energy Facility and Its Regulation

23.     In 1985, Wheelabrator Baltimore began operating the waste-to-energy facility that is targeted by the Baltimore Clean Air Act. The Facility receives non-hazardous, municipal solid waste from homes and businesses in the City and surrounding counties. Since opening, the Wheelabrator Baltimore Facility has processed over 23 million tons of post-recycled solid waste, generated 10 million megawatts of renewable electricity, and recycled 350,000 tons of metals. The Facility processes over 700,000 tons of waste annually on average, and it processed 709,904 tons in 2018. As the City's Department of Public Works ("DPW") candidly admitted in comments on the then-pending legislation, the only potentially viable alternative to disposal at the Wheelabrator Baltimore Facility for the City's solid waste would be landfilling – if landfill space is even available – at great additional expense to the City and other users, with significant adverse environmental impacts.

24.     Waste-to-energy facilities are among the most stringently regulated waste disposal facilities in the United States. To ensure that its Facility complies with all applicable regulations and permitting requirements, Wheelabrator Baltimore continuously monitors and records numerous air pollution control environmental parameters every minute of every operating hour, and the data are continuously compiled to ensure that the Facility remains within its permit and operating limits.

25.     Wheelabrator Baltimore receives the City's waste pursuant to the terms of Waste Disposal Agreements with the Regional Disposal Authority, an independent state agency that facilitates permitting and financing of solid waste projects in Maryland. In fact, the Wheelabrator Baltimore Facility was initially created when the Authority contracted in 1982 with the City and Wheelabrator Baltimore for the specific purpose of processing waste from the City to produce energy, finding that "it is in the public interest . . . to provide for the economies of scale and opportunities for resource recovery which can be achieved through a regional solid waste disposal facility." City of Baltimore Subdivision User Contract at 1, ¶ B, dated November 3, 1982. The Authority has entered into a separate contract with the City, providing for disposal of the City's solid waste by the Authority at the Wheelabrator Baltimore Facility.

26.     The Facility also receives solid waste from other surrounding counties and from private contractors. The Facility uses the solid waste as a fuel to provide renewable energy in the form of electrical power and steam, which lowers greenhouse gas emissions by both offsetting the use of fossil fuels and eliminating methane emissions (a greenhouse gas that is 28 times more potent than carbon dioxide) from landfills. EPA considers waste-to-energy facilities such as Wheelabrator's a "key part of the non-hazardous waste management hierarchy."[3] Wheelabrator Baltimore generates renewable energy, reduces carbon emissions by offsetting the need for energy from fossil fuels, thus eliminating methane generation from landfills. A portion of the City's waste that does not go to Wheelabrator Baltimore is disposed of at the City-owned Quarantine Road Landfill ("QRL"). If waste were to be diverted from Wheelabrator Baltimore to remote landfills, there would be significant long-haul trucking and attendant environmental and traffic impacts

---

[3] *See* Energy Recovery from the Combustion of Municipal Solid Waste (MSW), U.S. Environmental Protection Agency, U.S. EPA, (last accessed April 22, 2019), https://www.epa.gov/smm/energy-recovery-combustion-municipal-solid-waste-msw.

along with a significant increase in greenhouse gas emissions from all the landfills where the waste will be disposed.

27.     Wheelabrator Baltimore converts 90% of the volume of solid waste it receives into clean, renewable energy and steam, with the remaining 10% reduced to inert ash, which is disposed of in a landfill. Prior to ash disposal, the Facility recovers ferrous and non-ferrous metals, such as iron, steel, copper, and aluminum. Approximately 11,000 tons of recovered metals are sold and recycled into new products annually, displacing the need for mining and processing raw metal ores, and eliminating associated energy consumption environmental impacts.

28.     Wheelabrator Baltimore's waste-to-energy Facility is a Tier 1 renewable resource under Maryland's Renewable Portfolio Standard ("RPS"), making it eligible to receive and accumulate renewable energy credits. Md. Code Ann., Pub. Util. § 7-701, *et seq*. Maryland's RPS provides financial incentives to new and clean sources of renewable energy that reduce greenhouse gases and other hazardous air and water pollution – including waste-to-energy. Md. Code Ann., Pub. Util. § 7-704(f)(2). The Maryland General Assembly specifically found in the RPS that "the benefits from renewable energy resources, including long-term decreased emissions, a healthier environment, increased energy security, and decreased reliance on and vulnerability from imported energy sources, accrue to the public at large." Md. Code Ann., Pub. Util. § 7-702(b)(1). Closure of the Wheelabrator Baltimore Facility due to the passage of the Act would conflict with and undermine the state-incentivized RPS benefits.

29.     The Wheelabrator Baltimore waste-to-energy Facility consists of three municipal waste combustor units, each able to receive 750 tons per day ("TPD") of municipal solid waste, yielding a Facility-wide capacity of 2,250 TPD. The steam generated by the combustor units is used to power a turbine that generates as much as 46 megawatts of clean, renewable electricity –

the equivalent of powering roughly 40,000 Maryland homes. Further, Wheelabrator Baltimore delivers "green steam" every day to the Baltimore downtown district energy system operated by Veolia North America, which serves more than 255 local businesses.

30.     As required by federal and state regulations discussed below and the strict and detailed requirements of its Title V permit, the Wheelabrator Baltimore Facility controls its air emissions using extensive, intricate, and sophisticated air pollution controls. Combustion gases are exhausted through a stack that contains three flues, one for each of the three combustors. Each combustor is equipped with a selective non-catalytic reduction ("SNCR") system to reduce nitrogen oxides emissions, a slaked lime slurry spray dryer absorber system to control acid gas emissions such as sulfur dioxide, a powdered activated carbon injection system for mercury and dioxin/furan removal, and a high efficiency electrostatic precipitator ("ESP") to remove particulate matter and trace metals from the exhaust streams. Each stack is equipped with a continuous opacity monitoring system ("COMS") for monitoring particulate emissions and continuous emission monitoring systems ("CEMS") for nitrogen oxides, sulfur dioxides, carbon monoxide, and carbon dioxide.

31.     Following criteria set in the federal CAA and the Maryland air laws, EPA and MDE utilized their expertise and set emissions standards and other controls for waste-to-energy facilities that fully protect human health and the environment. The CAA mandates multiple, conservative safety factors to ensure that these facilities, which perform a vital public service, protect the public health of the surrounding communities with an adequate margin of safety.

32.     In addition to managing much of the City's solid waste and generating clean energy, Wheelabrator Baltimore provides many economic benefits to the region. It employs 69 Maryland residents, 75% of whom live in the Baltimore area. It also supports 175 additional jobs in

transportation and support services that are connected to the Facility. Furthermore, Wheelabrator Baltimore contributes $50 million in economic activity annually to the City, Baltimore County, and the state through payroll, purchases of goods and services, and tax payments.

**C. The Curtis Bay Medical Waste Incineration Facility and Its Regulation**

33.     The Curtis Bay Facility began commercially operating in 1991 and accepts for disposal medical waste generated within Baltimore and the surrounding region. According to the City's approved SWMP, the City expects medical waste generators within the City to produce 10,818 tons of medical waste in 2019, most of which will be disposed of at Curtis Bay's Facility.

34.     The Curtis Bay Facility is permitted to incinerate a maximum total of 150 tons of medical waste per day. Its two incinerator units share a common stack. Each incinerator has its own pollution control system with a system of dampers that allow either pollution control train to be used with either incinerator. Each incinerator is equipped with secondary and tertiary combustion chambers, a heat recovery boiler, SNCR for control of nitrogen oxides, a dry injection acid gas scrubber, a powdered activated carbon injection system for mercury control, and a fabric filter with passive dioxins/furans emissions control. The stack is equipped with a COMS for monitoring particulate emissions and CEMS for monitoring carbon monoxide, hydrogen chloride, nitrogen oxides, and oxygen content in stack exhaust gases. The COMS and CEMS ensure that the facility operates within parameters that meet the emissions limits of its Title V permit, which are established according to EPA and MDE emissions regulations.

35.     In 2018, the Facility processed by incineration approximately 25,000 tons of medical waste. The processed medical waste is rendered safe for disposal at a sanitary landfill as ash. The conversion of medical waste to ash reduces its volume by 90% and its weight by 75%.

The Facility cleans and reclaims reusable sharps and other medical waste containers, further reducing the volume of waste entering landfills.

   **D.   The Federal and State Clean Air Act Framework Regulates Every Aspect of Air Emissions from Waste-to-Energy Facilities and Medical Waste Incinerators.**

   36.    The CAA creates a comprehensive and interlocking series of federal and state air pollution control regulations for all sources of air pollution in the United States, including waste-to-energy and HMIWI facilities. Maryland has codified its own air pollution control laws in line with this framework, and has promulgated corresponding regulations specifically pertaining to waste-to-energy and HMIWI facilities.

   37.    The CAA requires EPA to set National Ambient Air Quality Standards ("NAAQS"), which are health-based standards for outdoor air for specified "criteria" air pollutants. 42 U.S.C. § 7409. States then prepare State Implementation Plans ("SIPs") designed to meet these NAAQS. 42 U.S.C. § 7410. After an ambient standard is set for a pollutant at a level that is deemed protective of public health with an adequate margin of safety, EPA designates geographic areas or air quality regions as "attainment" or "nonattainment" based on their compliance with the standard. 42 U.S.C. § 7409. Further, the CAA mandates installation of certain types of air pollution control technology and imposes strict permit requirements that apply to major sources, including waste-to-energy facilities and HMIWI facilities, depending on the size of the facility and the attainment status of the geographic area. These requirements have been incorporated into regulations known as the Prevention of Significant Deterioration ("PSD") and Nonattainment New Source Review regulations that ensure new facilities do not adversely impact air quality. 42 U.S.C. § 7470, *et seq.*; 42 U.S.C. § 7501, *et seq.*

   38.    Best Available Control Technology ("BACT") is required for major new or modified sources in attainment areas. Lowest Achievable Emission Rate ("LAER" – which is the

lowest achievable emission rate at any comparable facility in the country) is required for major new or modified sources in nonattainment areas. In addition, the CAA requires that EPA issue New Source Performance Standards ("NSPS) for new sources and Emission Guidelines ("EG") for existing sources of air pollution under Section 111 of the CAA to ensure all sources minimize emissions and help attain and maintain air quality standards. *See* 40 C.F.R. § 60, subparts Cb and Ce.

39.     In 1990, Congress passed sweeping amendments to the CAA, significantly increasing the stringency of air pollution controls for sources such as waste-to-energy facilities and HMIWI facilities. Among other things, Congress added a new Section 129 that specifically regulated certain emissions (nitrogen oxides, sulfur dioxides, carbon monoxide, mercury, dioxins, hydrochloric acid, particulates, lead, and cadmium) from all types of solid waste combustors, including waste-to-energy facilities and HMIWI facilities. Section 129 required that EPA supplement Section 111 by promulgating even stricter NSPS for new solid waste combustion units, including waste-to-energy facilities and HMIWI facilities, and EG for existing solid waste combustion units that the states would be required to implement in their own regulations that would then be approved by EPA. Section 129 also requires EPA to review and, if appropriate, revise these standards and requirements in five-year intervals.

40.     Further, Section 129 requires that EPA determine that emission levels after the installation of pollution controls required to meet the EG provide an ample margin of safety to protect public health and that there are no remaining or "residual health risks," in the communities surrounding waste-to-energy facilities and HMIWI facilities, *i.e.*, that residual risk to individuals living in communities around the facilities is less than one lifetime additional cancer case per million people. If there is any remaining risk, EPA must further reduce the EG. This intricate

17

framework of federal and state laws and regulations protects public health in communities located near waste-to-energy facilities like the Wheelabrator Baltimore Facility and HMIWI facilities like the Curtis Bay Facility.

41.    Congress established the Title V operating permit program as part of the 1990 CAA Amendments. 40 C.F.R. § 70. The main purpose of the Title V program is to ensure that all federal and state air pollution emission limits and monitoring, recordkeeping, and reporting requirements are combined into one permit that is subject to public, state, and EPA review. Title V requires facilities like Wheelabrator Baltimore and Curtis Bay to obtain an operating permit, operate in compliance with that permit, and certify at least annually its compliance or noncompliance with all permit requirements. Section 129 also mandated that all solid waste combustion units covered by that provision (which includes waste-to-energy and HMIWI facilities) operate pursuant to a Title V operating permit. Title V requires that EPA and MDE work together to implement the permitting program. EPA published its Title V regulations in 1992; Maryland adopted state implementation regulations and submitted its Title V program to EPA in 1995; and EPA approved Maryland's regulations in July of 1996, making them effective in August of 1996. All regulated solid waste combustion units are required to obtain Title V permits at deadlines established according to EPA's promulgation of EG for each type of unit. Accordingly, MDE is the sole authority for issuing Title V permits for all major sources and solid waste combustion units within the state, including the Wheelabrator Baltimore and Curtis Bay Facilities. COMAR 26.11.03; COMAR 26.11.08 *et seq.*

42.    Further, Maryland state law protects public health from air emissions through its own toxic air pollutant ("TAP") regulations, first promulgated in 1988 for pollutants such as trace metals, hydrochloric acid, and dioxins. COMAR 26.11.15, *et seq.* These regulations require that a

facility quantify its emissions of toxic air pollutants, apply best available control technology for toxics, and demonstrate that impacts from those emissions will not adversely affect public health by meeting a specific health risk-based ambient air quality standard for each pollutant. Wheelabrator Baltimore and Curtis Bay submitted initial ambient TAP air quality standard compliance demonstrations in accordance with applicable regulations, and have submitted updated compliance demonstrations as necessary or when requested by MDE.  These demonstrations have shown that offsite impacts are well below applicable health risk-based ambient standards.

E. **Wheelabrator Baltimore has a Comprehensive Title V Permit Under Federal and State Law that Governs All Aspects of Air Quality.**

43.      MDE issued an initial PSD air permit to the Wheelabrator Facility in 1983, and a New Source Impacting Nonattainment Area permit in 1984. At the time of permitting, Wheelabrator Baltimore was defined as a "major source" that employed BACT for sulfur dioxides, nitrogen oxides, and carbon monoxide, and LAER for particulate matter.

44.      MDE issued Wheelabrator Baltimore its first Title V permit on November 5, 2001 and its current permit on April 1, 2014. The Title V permit is 52 pages and appends a 36-page operating permit fact sheet. *See* Exhibit B. This detailed permit includes emissions limitations and monitoring requirements that reflect the CAA Sections 111 and 129 EG for waste-to-energy facilities as well as BACT and LAER requirements discussed above, operational limitations, and work practices applicable to each combustor located at the waste-to-energy Facility.

45.      Specifically, the Title V permit establishes the following emission limits for the Wheelabrator Facility: 205 parts per million, volumetric dry ("ppmvd")/dscm for nitrogen oxides and, effective May 1, 2019, 150 ppmvd; 29 ppmvd or 75% reduction of sulfur dioxides emissions by weight or volume; 50 μg/dscm for mercury or 85% reduction of mercury emissions by weight; and 35 ng/dscm for dioxin/furans with ESP based control device. Moreover, the Title V permit

requires CEMS monitoring for nitrogen oxides, sulfur dioxides, and carbon monoxide, plus a continuous opacity monitor (COMS), to ensure compliance with emission limits for these pollutants. The permit further requires periodic monitoring of mercury, lead, and cadmium and dioxins/furans using EPA-approved and validated test methods along with continuous monitoring of carbon feed rate, ESP inlet temperature, and steam flow to ensure compliance with the mercury and dioxin/furan limits.

46.     In stark conflict with the Title V permit, the Baltimore Clean Air Act requires that a facility's CEMS be operational at all times that the facility is functioning (*i.e*., 100 percent of the time), and imposes violations for gaps in monitoring of more than thirty minutes.  This requirement is physically impossible to meet, and it contradicts the federal and state rules that recognize and allow for necessary downtime including repairs, calibration checks, and adjustments to the monitoring systems to ensure their accuracy.  Under federal and state regulations applicable to the Wheelabrator Baltimore Facility, valid emissions data must be obtained for a minimum of 90 percent of operational hours per calendar quarter, and 95 percent of operational hours per calendar year that the facility is combusting municipal solid waste. *See* 40 C.F.R. § 60.38b; 40 C.F.R. § 60.58b; COMAR 26.11.08.08.

47.     As mandated by the Title V regulations, the periodic testing and CEMS requirements contained in the permit have been through rigorous state and federal review, subject to public review and comment, and have been determined to be adequate for monitoring emissions and determining compliance with emission limits.

48.     The Title V permit further identifies each and every federal and state air law and regulation that is applicable to the Wheelabrator Baltimore Facility. The permit makes no reference

to local air laws, because none existed until Baltimore attempted to countermand the permit through its Baltimore Clean Air Act.

**F.  Recent Federal and Maryland Laws and Regulations Have Further Tightened Controls on the Wheelabrator Facility.**

49.     Because the Wheelabrator Baltimore Facility started operating in 1985, it is an existing large Municipal Waste Combustor ("MWC")[4] and is subject to the federal EG under 40 C.F.R. § 60, subpart Cb: *Emissions Guidelines and Compliance Times for Large Municipal Waste Combustors that are Constructed on or before September 20, 1994*. EPA promulgated this subpart in 1995 in accordance with Section 111(d) as required by Section 129 of the CAA Amendments of 1990. The State of Maryland, in turn, had the responsibility of developing its own regulations to implement the EG, and subsequently, in 1997, adopted EPA's EG verbatim in the Code of Maryland Regulations at COMAR 26.11.08.08. All affected waste-to-energy facilities were required to come into compliance with the requirements of the EG by December 19, 2000.

50.     At that time, these regulations required that waste-to-energy facilities install Maximum Achievable Control Technology ("MACT") pollution controls to reduce their emissions of certain pollutants. Pursuant to its requirement to review the regulations every five years, in May of 2006, EPA revised the EG for existing municipal waste combustors. These revisions included more stringent standards for five regulated pollutants, including mercury and dioxin/furans: 50 µg/dscm for mercury or 85% reduction of mercury emissions by weight; and 35 ng/dscm for dioxin/furans for facilities using an ESP system such as Wheelabrator Baltimore. EPA also tightened requirements for the minimum amount of time that continuous emissions monitoring

---

[4] As used herein, the terms "municipal waste combustors" and "waste-to-energy" facilities are synonymous.

devices be online. Maryland incorporated these EPA amendments verbatim in October 2007, and the revised standards became effective on April 28, 2009.

51.    In 2017, MDE conducted a rulemaking to further tighten its regulations regarding waste-to-energy facilities and lower the nitrogen oxides emission limit pursuant to the federally enforceable SIP in order to meet the federal ozone ambient air quality standard. Explicitly recognizing that "MDE has the authority to set NOx emission limits," on July 11, 2017, the Baltimore City Council passed Resolution 17-0034R, requesting that MDE set a nitrogen oxides emission limit of no higher than 150 ppmvd for the Wheelabrator Facility. By passing this and similar resolutions, Defendant City followed the narrow – and only – pathway allowed under the State air laws for Baltimore to seek changes to federal and state air emissions regulations: to ask MDE to revise the regulations. Md. Code Ann., Envir. § 2-104(b). On December 6, 2018, after public comment and technical review, MDE's final rule became effective under Maryland's SIP reducing the Wheelabrator Baltimore Facility's limit for nitrogen oxides from 205 ppmvd to 150 ppmvd starting on May 1, 2019, adopting the limit requested by the City, and further reducing the limit to 145 ppmvd by May 1, 2020. COMAR 26.11.08.10. The Baltimore Clean Air Act upends these carefully promulgated requirements, and inexplicably vitiates the very limit the City requested MDE to adopt.

52.    MDE's newly adopted municipal waste combustor rule also requires Wheelabrator Baltimore, no later than January 1, 2020, to submit to MDE a feasibility analysis by an independent third party for the additional control of nitrogen oxides emissions, and to propose with it new nitrogen oxides limits based on the results of the feasibility analysis. COMAR 26.11.08.10.E. By enacting the Baltimore Clean Air Act before the feasibility study has even been conducted, the

City's actions directly conflict with and override MDE's specific plan for further addressing emissions from the Wheelabrator Baltimore Facility.

53.     On September 17, 2018, the City Council passed another resolution requesting MDE action regarding air emissions from the Wheelabrator Baltimore Facility. This resolution (Resolution 18-0101R) was adopted one month after MDE published its proposed rule (which reduces the Wheelabrator Baltimore Facility's nitrogen oxides emission limit to the exact standard requested by the City in its 2017 resolution), and only one month before Councilman Edward Reisinger first introduced the Baltimore Clean Air Act. Resolution 18-0101R, again, explicitly recognizing that "MDE has the authority to set NOx emission limits," requested that MDE "require a rigorous analysis" of Wheelabrator Baltimore's feasibility study due January 2020, and "fully evaluate the technical feasibility" of installing certain control technology at Wheelabrator Baltimore "regardless of cost or whether the technology has been used in other retrofits."  As discussed above, MDE's final rule became effective on December 6, 2018, adopting the City's requested nitrogen oxides emissions standard, and requiring Wheelabrator to conduct the feasibility study and propose its own new nitrogen oxides limits based on the analysis. Both of the City's resolutions (17-0034R and 18-0101R) requested that MDE take action to change state air emissions regulations, the only pathway for the City to take such action under Md. Code Ann., Envir. § 2-104(b).

54.     Pursuant to the federal and state regulations for MWCs, Wheelabrator Baltimore's current Title V permit establishes emission limits for pollutants and monitoring requirements at its Facility as set forth below in Table 1, which compares the current federal and state limits and monitoring provisions, other requirements for existing sources, and Wheelabrator Baltimore's Title V permit limits, with the Baltimore Clean Air Act:

| TABLE 1 | | | | |
|---|---|---|---|---|
| Pollutant | Federal Emission Guidelines for Existing MWCs | Maryland Emission Limits for Existing MWCs | Wheelabrator Baltimore's Title V Permit Emission Limits for MWCs | Baltimore Clean Air Act Emission Limits |
| Year Approved | 1995 (Updated 2006) | 1997 (Updated 2016) | 2001 (Reissued 2014) | 2019 |
| Nitrogen Oxides (NOx) | 205 ppmvd | 150 ppmvd (May 2019) and 145 ppmvd (May 2020) | 205 ppmvd | 45 ppmvd – 24 hour block average; 40 ppmvd - 12 month rolling average |
| Sulfur Dioxides ($SO_2$) | 29 ppmvd or 75% reduction of $SO_2$ emissions | 29 ppmvd or 75% reduction of $SO_2$ emissions | 29 ppmvd or 75% reduction of $SO_2$ emissions | 18 ppmvd |
| Mercury (Hg) | 50 µg/dscm or 85% reduction of Hg emissions | 50 µg/dscm or 85% reduction of Hg emissions | 50 µg/dscm or 85% reduction of Hg emissions | 15 µg/dscm |
| Dioxins/ Furans (D/F) | 35 ng/dscm | 35 ng/dscm | 35 ng/dscm | 2.6 ng/dscm (TEQ basis)[5] |
| CEMS Requirement | NOx, $SO_2$, CO, opacity | NOx, $SO_2$, CO, opacity | NOx, $SO_2$, CO (CEMS)  Opacity (COMS)  $CO_2$ reporting under EPA greenhouse gas program | $NO_x$, SO2, CO, D/F, PM, $CO_2$, Hydrochloric Acid (HCl), Hydrofluoric Acid (HF), Volatile Organic Compounds (VOCs), Polycyclic Aromatic Hydrocarbons (PAHs), and metals |
| CEMS Availability | 90% hours per quarter, 95% hours per year | 90% hours per quarter, 95% hours per year | 90% hours per quarter, 95% hours per year | 100% |

[5] The Act's unit of measurement for dioxins/furans ($TEQ_{DF}$-$WHO_{98}$) is inapplicable to MWCs. Nowhere in the federal or state regulations setting EG for MWCs, or in Wheelabrator Baltimore's Title V Permit, is the TEQ unit included to measure dioxins/furans.

| Air Monitoring Contractor Requirement | No | No | No | Yes |
|---|---|---|---|---|
| Strict Criminal Liability | No | No | No | Yes |

As is evident from the chart and as discussed below, the Act imposes much more stringent requirements than any federal or state regulatory limits or the Title V permit for Wheelabrator Baltimore, creating a pervasive conflict with the federal and state system. Moreover, the City has not provided any scientific, technical, or factual basis that these limits and additional CEMS requirements are either achievable or necessary, nor why the City seeks to require CEMS for those pollutants that have no applicable limits in either federal or state law (including polycyclic aromatic hydrocarbons, volatile organic compounds, hydrofluoric acid, and all but two metals).

### G. The Curtis Bay Facility Is Governed by Strict Federal and State Air Quality Regulations and Is Subject to a Comprehensive Title V Permit.

55.     As explained above, Section 129 of the CAA directed EPA to promulgate EG for existing HMIWI facilities. In 1994, EPA published its first regulatory impact analysis in connection with this directive, which was also partially in response to an influx of medical waste that was supposedly destined for landfills washing up on east coast shorelines. *Medical Waste Incinerators – Background Information for Proposed Standards and Guidelines: Regulatory Impact Analysis*, p. 2-1, EPA-453/R-94-063a, July 1994. In its regulatory impact analysis, EPA highlighted several trends that factored into its evaluation of nationwide air emission standards for medical waste incinerators including: i) that the quantity of medical waste was increasing; ii) the need to provide optimal control of air emissions from medical waste incinerators was increasing; iii) that state and local restrictions of medical waste incinerators had increased; and iv) that state and local regulation of medical waste had become uneven leading to an uncertain regulatory

climate. *Id.* at 6-1. The patchwork of state and local regulation made it difficult to manage medical waste on a regional or nationwide basis as some regions lacked disposal capacity while others had excess capacity, creating, in EPA's words, the need for a "leveling of the playing field". *Id.* at 6-4. EPA reasoned that "temporary shortfalls of [HMIWI] capacity can be averted if the adoption of new regulations is coordinated with careful planning and expedient permitting." *Id.* EPA also concluded that incineration is the only way to safely dispose of certain types of infectious medical waste, such as pathological (i.e. tissue and fluids) or infectious waste. *Id.* at 6-5.

56.     EPA first proposed EG in 1997 that required existing HMIWI facilities to demonstrate compliance by September 15, 2002. These EG were promulgated to reduce emissions of cadmium, carbon monoxide, dioxins and furans, hydrogen chloride, lead, mercury, nitrogen oxides, opacity, particulate matter, and sulfur dioxides. The EG reflected the maximum degree of reduction in air emissions at that time considering the environmental impacts, cost of achieving the emissions reduction, non-air quality health impacts, and energy requirements. 42 U.S.C. § 7429(a)(2). The result of this analysis is considered the MACT. *Id.* Under federal regulations, the EG for existing HMIWI facilities must be as stringent as the best performing 12% of existing HMIWI facilities in the nation. *Standards for Performance of New Stationary Sources and Emissions Guidelines for Existing Sources: Hospital/Medical/Infectious Waste Incinerators: Proposed Rule* 73 Fed. Reg. 72962 (December 1, 2008). The MACT first proposed by EPA in 1997 was designed to reduce dioxin and furan emissions by up to 97%, mercury emissions by up to 95%, particulate matter by up to 92%, lead emissions by up to 87%, cadmium emissions by up to 84%, carbon monoxide emissions by up to 82%, hydrogen chloride emissions by up to 98%, and sulfur dioxides and nitrogen oxides emissions by up to 30%. *Id.*

57.     In 2008, EPA proposed new and revised EG for existing HMIWI facilities to implement a more stringent MACT standard. *Id*. The revised EG incorporated a new MACT standard derived from the performance of the most efficient HMIWI facilities based on emissions monitoring data submitted by regulated sources following implementation of the 1997 standard, as well as the existence of new technologies and process improvements at existing HMIWI facilities. *Id*. The revised 2008 EG were formally adopted in the final federal rules on May 13, 2013. *Federal Plan Requirements for Hospital/Medical/Infectious Waste Incinerators Constructed On or Before December 1, 2008, and Standards of Performance for New Stationary Sources: Hospital/Medical/Infectious Waste Incinerators: Final Rule,* 78 Fed. Reg. 28052 (May 13, 2013); 40 C.F.R. § 60, subpart Ce. In its rulemaking process, EPA noted that the implementation of the 1997 federal rules had accomplished its public policy goal of reducing emissions, reducing the amount of medical waste that was incinerated, and re-directing that medical waste that required incineration to a smaller number of highly-regulated HMIWIs, commenting that of the approximately 2,400 HMIWI units in operation in September 1997 (of which 3% were commercially owned), only 57 HWIWI units were in operation by 2008 (of which 23% were commercially owned- such as the Curtis Bay Facility).   *Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Hospital/Medical/Infectious Waste Incinerators: Proposed Rule,* 73 Fed. Reg. 72962, 72967 (Dec. 1, 2008).

58.     The Maryland SIP establishes EG for HMIWI facilities operating within the state that are identical to the 2013 federal rules. COMAR 26.11.08.08-2, *et seq*. The Maryland SIP required compliance no later than June 15, 2012, or no later than October 6, 2014 if a HMIWI facility was required to modify existing equipment or install new equipment to meet the EG. COMAR 26.11.08.08-2(E)(1). The current Maryland SIP for HMIWI EG was approved by EPA

and published in the Federal Register on April 28, 2017. *Approval and Promulgation of Air Quality Plans; State of Maryland; Control of Emissions from Existing Hospital/Medical/Infectious Waste Incineration Units*, 82 Fed. Reg. 19613 (Apr. 28, 2017).

59.     The Maryland SIP approved by EPA in 2017 involved a thorough public rulemaking process that sought input from all stakeholders including the regulated community, residents, environmental groups, and state and local governments, including the City. *See* Exhibit C, MDE Letter to EPA Submitting Maryland's SIP for HMIWI EG (Jan. 10, 2013). The process, which began in 2011, included a September 12, 2012 public meeting in Baltimore City providing stakeholders and interested parties the opportunity to provide comment. *Id.* MDE sent notice of the meeting to the City on August 8, 2012. *Id.* No representative from the City of Baltimore or any member of the public or any group attended the meeting. *Id.* The City did not otherwise provide any comments to the proposed SIP. *Id.* Lastly, the City has not requested that MDE adopt stricter EG for regulated HMIWI facilities operating within Baltimore as it is permitted to do under Section 2-104(b) of the Maryland Code's Environment Article.

60.     The Curtis Bay Facility is a HMIWI facility that  began commercial operation  in 1991, making it an "existing" HMIWI facility subject to the federal EG pursuant to 40 C.F.R. § 60, subpart Ce. Curtis Bay was issued its first five-year Title V permit by MDE pursuant to EPA's EG in 2003. Its most recent Title V permit has been issued and goes into effect May 1, 2019.  *See* Exhibit D.   The Facility's Title V permit sets emissions limits for particulate matter (25 mg/m$^3$), opacity (10%), carbon monoxide (11ppm), dioxins and furans (0.054 ng/dscm),[6] hydrogen chloride (6.6 ppmv), sulfur dioxides (9.0 ppmv), nitrogen oxides (140 ppmv), lead (0.036 mg/dscm),

---

[6] Dioxin and furan emissions are quantified by nanograms (1/1,000,000 gram) per cubic meter on a toxic equivalency factor (TEQ) basis for HMIWI facilities.

cadmium (0.0092 mg/dscm), and mercury (0.018 mg/dscm). The Title V permit also includes continuous emissions monitoring of certain pollutants. And, consistent with federal and state regulations, the permit requires that valid emissions data must be obtained for a minimum of 75 percent of operational hours per day and for 90 percent of the operating days per calendar quarter that the facility is combusting medical waste. *See* 40 C.F.R. § 60.37e(d); 40 C.F.R. § 60.57c(e); COMAR 26.11.08.08-2B(5). These are the emissions limits that EPA and MDE have independently determined, after rigorous scrutiny, are the best achievable and protective of human health and the environment.

61.     In January 2018, Curtis Bay applied to MDE for a regular, five-year renewal of its Title V permit.  MDE subsequently published notice of its intent to reissue the Curtis Bay Facility's Title V permit consistent with the requirements of the federal Subpart Ce and Maryland SIP requirements, and on materially the same terms as its then-existing Title V permit.  MDE provided the required thirty-day opportunity for the public and all interested parties to provide comment and to even request a public hearing on the draft permit.  When that public notice period ended, not one single person or entity had provided any comment whatsoever to MDE or requested a hearing on the renewal of the Curtis Bay Title V permit.

62.     The renewed Curtis Bay Title V permit was released by MDE on April 12, 2019, and goes into effect May 1, 2019. The City had the opportunity to request that MDE impose stricter emissions limits on the Curtis Bay Facility during the permit's public comment period and to request a public hearing. The City made no such effort to shape the emission limits under the new Title V permit, an issue it now claims is a priority that requires action by and through the Act, despite the fact the Facility's new Title V permit would go into effect over a year before the Act's effective date of September 7, 2020. This failure by the Mayor and the City to use these well-

established opportunities to effect a present reduction in emissions from the Curtis Bay Facility demonstrates that the City's intent and goal with the Act was not to reduce emissions from the Curtis Bay Facility to levels less than currently permitted, but instead an attempt to utilize the legislative process to force the Facility to close.

63.    Table 2 reflects the current federal and state limits and CEMS requirements for existing HMIWI sources, and Curtis Bay's Title V permit limits, compared to the newly codified emission limits in the Baltimore Clean Air Act:

| TABLE 2 | | | | |
|---|---|---|---|---|
| Pollutant | Federal Emission Guidelines for Existing HMIWI | Maryland Emission Limits for Existing HMIWI | Curtis Bay's Title V Permit Emission Limits for HMIWI | Baltimore Clean Air Act Emission Limits |
| Year Approved | 1997 (Updated 2013) | 2000 (Updated 2012; Re-approved 2017) | 2003 (Reissued 2019) | 2019 |
| Nitrogen Oxides (NOx) | 140 ppmvd | 140 ppmvd | 140 ppmv  – 24 hour block average | 45 ppmvd – 24 hour block average; 40 ppmvd - 12 month rolling average |
| Sulfur Dioxides (SO$_2$) | 9 ppmvd | 9 ppmvd | 9 ppmvd | 18 ppmvd |
| Mercury (Hg) | 18 μg/dscm | 18 μg/dscm | 18μg/dscm | 15 μg/dscm |
| Dioxins/ Furans (D/F) | 0.054 ng/dscm (TEQ basis) | 0.054 ng/dscm (TEQ basis) | 0.054 ng/dscm (TEQ basis) | 2.6 ng/dscm (TEQ  basis) |
| CEMS Requirement | NOx, SO$_2$, CO | NOx, SO$_2$, CO | NOx, HCl, CO (CEMS) | NO$_x$, SO2, CO, D/F, PM, CO$_2$, HCl, |

| | | | Opacity (COMS) | Hydrofluoric Acid (HF), Volatile Organic Compounds (VOCs), Polycyclic Aromatic Hydrocarbons (PAHs), and metals |
|---|---|---|---|---|
| **CEMS Availability** | 75% of the operating hours per day for 90% of the operating days per quarter | 75% of the operating hours per day for 90% of the operating days per quarter | 75% of the operating hours per day for 90% of the operating days per quarter | 100% |
| **Air Monitoring Contractor Requirement** | No | No | No | Yes |
| **Strict Criminal Liability** | No | No | No | Yes |

64.     As is shown in the chart above, Curtis Bay's Title V permit establishes emissions limits consistent with the strict federal and state regulations that have been determined by both federal and state government environmental agencies to sufficiently protect human health and the environment.  Nonetheless, the Act requires further emissions limit reductions for most pollutants, together with other requirements that, as set forth in the following paragraph, are financially burdensome, impracticable, unnecessary, and, with respect to certain added CEMS requirements, technically infeasible. This is because the City's goal was not to conduct a rigorous scientific inquiry to derive emissions limits that would protect human health and the environment; rather, the City's goal was to impose impractical requirements to force the closure of the Facility, which the City is prohibited from directly ordering under federal and Maryland laws.

**H.**   **The Baltimore Clean Air Act Clashes With and Is an Obstacle to the Federal/State Air Pollution Control Structure.**

65.     The Baltimore Clean Air Act sets emission limits for several pollutants that countermand those established under Sections 111(d) and 129 of the CAA and the Maryland air laws (federal and state standards shown in Tables 1 and 2), including:

a.      For nitrogen oxides, the Act contravenes the federal and state limits by setting forth a nitrogen oxides emission limit of 45 ppmvd on a 24-hour block average and 40 ppmvd on a 12-month rolling average. Wheelabrator Baltimore and Curtis Bay cannot meet these limits with their current nitrogen oxides control technology. Further, the City gave no consideration to whether there exists any technology capable of meeting the nitrogen oxides limits that can be retrofitted at the Wheelabrator Baltimore Facility.

b.      The Act also slashes the federal and state limit for sulfur dioxides to 18 ppmvd and does not include the alternative compliance method for waste-to-energy facilities provided under federal and Maryland law of 75% reduction of sulfur dioxides. Wheelabrator Baltimore is designed and has been authorized by MDE and EPA to rely on the federal and state alternative provision of 75% reduction of sulfur dioxide emissions measurement to stay in compliance with its Title V permit. Under current operating conditions, and employing the current technology at the Facility, Wheelabrator Baltimore cannot meet the Baltimore Clean Air Act's sulfur dioxide requirements.

c.      Likewise, the Act drastically reduces the mercury limit to 15 µg/dscm; does not include the percent reduction compliance alternative set forth in EPA/MDE's regulations and the Facilities' permits; and requires the use of CEMS for demonstrating compliance. There is, however, no CEMS technology available that can reliably and accurately measure the low emission levels of gaseous mercury compounds.

32

d.      EPA and MDE regulations and the Facilities' Title V permits require technically available CEMS for nitrogen oxides, sulfur dioxides, carbon monoxide, and opacity for which EPA has developed performance specifications and quality assurance requirements to confirm the accuracy and repeatability of the measurements. The Baltimore Clean Air Act abruptly enlarges the number of air pollutants for which the Facilities will be forced to employ CEMS, including dioxins/furans, particulate matter, carbon dioxide, sulfur dioxide, hydrochloric acid, hydrofluoric acid, volatile organic compounds, polycyclic aromatic hydrocarbons, and metals. However, there are currently no EPA-approved CEMS technologies available to combustion facilities that could be used to monitor for several of the pollutants, including polycyclic aromatic hydrocarbons and the Act's list of trace metals. Moreover, the Act's CEMS requirement for polycyclic aromatic hydrocarbons, volatile organic compounds, hydrofluoric acid and several of the Act's listed metals is unnecessary given the absence of emission limits for those pollutants in the Act.

e.      Federal and state regulations, as well as Wheelabrator Baltimore and Curtis Bay's Title V operating permits, account for necessary downtime to perform repairs, calibration checks, and additional adjustments on CEMS equipment. The rules and permits specify that valid emissions data should be obtained for a minimum of 90 percent of operational hours per calendar quarter, and 95 percent of operational hours per calendar year that the Wheelabrator Baltimore Facility is combusting municipal solid waste. For the Curtis Bay Facility, valid emissions data must be obtained for a minimum of 75 percent of operational hours per day and for 90 percent of the operating days per calendar quarter that its Facility is combusting medical waste. In stark contrast, the Act imposes a physically impossible standard for CEMS; namely, that CEMS be

operational at all times that the facility is functioning, without accounting for any requisite downtime for maintenance and upkeep.

66.     Indeed, Baltimore's DPW acknowledges that Wheelabrator Baltimore must shut down for an indeterminate period to perform the retrofits necessary to meet the Act's requirements. *See* Exhibit E, Baltimore DPW Memorandum to Baltimore City Council, dated January 28, 2019. But DPW has not analyzed whether such compliance is even possible, and Wheelabrator Baltimore is at this point still analyzing whether, even after the expenditure of tens of millions of dollars, it can meet the terms of the Act. In addition, there are significant lead times (months to years) associated with permitting and contracting for, designing, delivering, installing, testing, and operating such systems, if such systems could even be retrofitted at the Facility.

67.     DPW further acknowledges that Wheelabrator Baltimore may have to shut down the Facility completely as a result of the legislation. *See id.* This would mean all of Baltimore City's waste currently handled by the waste-to-energy Facility would have to be transported to the QRL and all non-City waste would need to find alternative disposal locations well outside the City and even the Baltimore metropolitan region. *See id*. According to DPW's most recent "Fiscal Analysis of Possible Impacts" of the Act, the QRL is expected to reach full capacity by 2026. *See* Exhibit F, Baltimore DPW Fiscal Analysis of Possible Impacts of City Council Bill 18-0306, dated February 2019. If Wheelabrator Baltimore shuts down, the QRL would reach capacity much earlier, causing significant solid waste disposal problems for the City and its residents. DPW estimates that plans for expansion at QRL would cost Baltimore taxpayers $99.7 million. However, recognizing that post-legislation, full capacity will be reached before an expansion is completed, DPW noted that it will have to evaluate alternate locations for another landfill in the City in the

long-term. Further, DPW cautioned that before a permanent solution for disposal could be found, interim measures would require a significant investment of City funds. *See id.*

68.    In sum, the Wheelabrator Baltimore Facility and Curtis Bay Facility meet the environmentally protective CAA Section 129 and 111 federal and state air emission standards and the BACT/LAER technology standards required by EPA and Maryland statutes and regulations and their respective Title V permits, as well as MDE air toxics regulations, all of which were established in a science-based and transparent manner, and subject to public comment processes. The Facilities cannot meet all of the standards in the Baltimore Clean Air Act, which did not go through any fact gathering, considered evaluation, or rulemaking procedures, and which contradict the well-reasoned federal and state laws in favor of non-science-based, arbitrary, and capricious mandates.

## I.    The Baltimore Clean Air Act Conflicts With and is Preempted by Maryland's Solid Waste Laws.

69.    Title 9 of Maryland's Environmental Article and MDE's implementing regulations create a comprehensive scheme that governs solid waste management as well as the permitting, construction, and operation of any refuse disposal system, including waste-to-energy facilities and HMIWI facilities. Md. Code Ann., Envir. §§ 9-204 – 9-229, 9-501 – 9-521; Nat. Res. §§ 3-901 *et seq.*; COMAR 26.03.03; COMAR 26.04.07.01 – 27 (collectively, the "Solid Waste Laws"). The Solid Waste Laws specifically mandate the creation of, requirements for, and implementation of SWMPs for Maryland counties and cities. Also, any operator of a refuse disposal system must obtain a permit from MDE before construction and then maintain its permit for the duration of its operations. Md. Code Ann., Envir. § 9-204.

70.    MDE's regulations set forth numerous requirements specific to waste combustors and landfills, including standards for access to the facility, environmental protection, supervision

and training of personnel, sanitation, fire control, and other requirements. COMAR 26.04.07. MDE's regulations prohibit the disposal of medical waste at any solid waste facility unless specifically authorized by MDE. COMAR 26.04.07.03. These statutes and regulations cover in detail all aspects of the management of solid and medical waste by Maryland counties and Baltimore City including the Wheelabrator Baltimore Facility and the Curtis Bay Facility. The comprehensiveness with which the Maryland General Assembly has legislated in the solid waste field, including through the City's and Baltimore County's SWMP obligations and Wheelabrator Baltimore's and Curtis Bay's state-issued refuse disposal permits, preempt the Baltimore Clean Air Act.

71.     MDE requires that municipalities, including Baltimore City and County, create and submit for approval a SWMP. COMAR 26.03.03. MDE approved Baltimore's current SWMP on March 24, 2016, and it covers the ten-year period 2013–2023. Baltimore County's SWMP was approved on February 20, 2019 for the period 2019–2028. The City's SWMP expressly states that solid waste is "governed by federal and state laws that regulate local practices to protect public health and welfare." SWMP ¶ 1.3.

72.     Baltimore City's SWMP states that "[e]ffective collection and disposal of solid waste is critical to public health." SWMP ¶ 1.1. In order to achieve its goal to safeguard public health, the SWMP relies heavily upon the Wheelabrator Baltimore Facility, where the City disposes the majority of its solid waste; the remainder of the City's non-recyclable waste ultimately ends up at the QRL. SWMP ¶¶ 3.4, 4.2. The City underscored to MDE the importance of the two facilities, stating in the plan that "[a]ssessing Baltimore's need to alter, extend, modify, or add to the existing solid waste disposal system with regards to waste treatment and disposal depends on

the capacity of these facilities." SWMP ¶ 4.2. The Wheelabrator Baltimore Facility processes

2,100 tons of waste daily on average.

73.     Baltimore represented to MDE that the Wheelabrator Baltimore Facility "has

obtained and operates in compliance with necessary City, State, and federal permits," that

"[e]missions from the electrostatic precipitators equipped smokestacks are monitored by the

MDE," and that the "anticipated service life of the plant is over 20 years."  SWMP ¶ 3.4.1. The

City touted its disposal agreement with Wheelabrator Baltimore, noting that it "assure[s] the City's

capabilities of safely and properly disposing of wastes far into the future." SWMP ¶ 4.3. The City

represented that the Wheelabrator Baltimore Facility "reduces the volume of landfill space that the

debris occupies by up to 90 percent," and that "[t]he dense compaction of [Wheelabrator] ash has

extended [the landfill's] life expectancy." SWMP ¶ 4.2.2.1. The City concludes that "[u]tilizing

the Wheelabrator plant is in accord with the City's sustainability goals because the Facility

generates renewable energy, providing a new carbon reduction and recovery of metals from the

waste stream." SWMP ¶ 5.2.3. Relying on all of these representations, MDE approved the City's

SWMP.

74.     In addition to operating subject to its Title V air permit, Wheelabrator Baltimore

also operates under an MDE-issued Refuse Disposal Permit. *See* Exhibit G, Wheelabrator

Baltimore's Refuse Disposal Permit (No. 2016-WTE-0030). Wheelabrator's RDP was issued on

March 3, 2017 and is valid for 5 years, expiring March 2, 2022. The RDP requires the Facility to

be "operated and maintained in such a manner as to prevent air, land, or water pollution, public

health hazards or nuisances." RDP, Part V.D. The RDP vests MDE with the right to approve of all

pollution control devices installed at the Facility: "All pollution control and ground and surface

water monitoring systems (including stormwater management and sediment control systems) shall

be installed in accordance with the manufacturer's recommendations and plans and specifications approved by the Department [MDE]." RDP, Part V.O.1. Importantly, it is not Baltimore, but MDE, that "reserves the right to restrict the volume of material accepted at [the] facility upon a determination that . . . conditions which are prejudicial to quality of the environment or the public health, safety, or comfort have occurred or are likely to occur." RDP, Part II.C.2. By causing the Wheelabrator Baltimore Facility to shut down, the City has effectively restricted the volume of material that can be accepted at the Facility, which is an impermissible invasion of MDE's authority.

75.     Similar to Wheelabrator Baltimore, the Curtis Bay Facility operates under an MDE-issued medical waste incineration RDP. *See* Exhibit H, Curtis Bay's Refuse Disposal Permit (No. 2017-WMI-0036). The RDP was issued on June 12, 2017 and expires on June 12, 2022. The RDP permits the Curtis Bay Facility to accept 62,050 tons of medical waste per year. Curtis Bay RDP, Part II.E.1. The RDP authorizes Curtis Bay to accept for incineration medical wastes as well as over-the-counter and prescription pharmaceuticals preventing those pharmaceuticals from entering municipal waste streams through flushing or landfilling. Curtis Bay RDP, Part III.A.2. The RDP vests MDE with the right to approve of all pollution control devices installed at the Facility: "All pollution control and ground and surface water monitoring systems (including stormwater management and sediment control systems) shall be installed in accordance with the manufacturer's recommendations and plans and specifications approved by the Department [MDE]." Curtis Bay RDP, Part III.O.1. The RDP obligates Curtis Bay to report any damage to the Facility's pollution monitoring or control devices to MDE and MDE may specify the timeframe for completing necessary repairs. Curtis Bay RDP, Part III.O.2. Further, "[t]he Department reserves the right to restrict the volume of material accepted at this facility upon a determination

that nuisance conditions, harborage of disease vectors, fugitive dust, blowing litter, or other conditions which are prejudicial to the quality of the environment or the public health, safety, or comfort have occurred or are likely to occur as a result of this practice." Curtis Bay RDP, Part II.E.2.

76.     The Act seeks to interfere with the pollution control plans and specifications approved by MDE by enforcing stricter emission controls, emissions monitoring, and reporting requirements that will require the installation of new pollution control equipment. The Act supersedes MDE's approval of the pollution control devices in the Curtis Bay Facility's RDP. Additionally, the Act will require Curtis Bay to either shut down or restrict the volume of medical waste processed while it installs new pollution control devices to comply with the Act. In this manner, the City attempts to assume MDE's authority to restrict the volume of material to be accepted at the Facility.

77.     The City has recognized the limits on its ability to use City law to qualify or conflict with its SWMP. In 2010, the City passed Zoning Bill 09-0400 to repeal certain geographic restrictions on the acceptance of waste by the Curtis Bay Facility. In its memo to the City Council providing its legal analysis of the proposed legislation, the City Solicitor observed that "City laws imposing geographic limits on waste acceptance qualify the provisions of the existing SWMP, in effect amending the plan legislatively." Memorandum Regarding City Council Bill 09-0400, City of Baltimore Department of Law, p. 4 (Dec. 9. 2009). The Solicitor concluded that "[t]his action is preempted by the State's occupation of the field of solid waste management and prohibited by State law which requires revisions to the SWMP to be approved by MDE." *Id.* The Baltimore Clean Air Act similarly imposes limits on waste acceptance by causing the Facilities to temporarily or permanently shut down, reducing the amount of waste the Facilities can process, in effect,

amending the SWMP by City fiat. This action is preempted by the State's occupation of the majority of the field of solid waste management (except zoning and other purely local issues) and prohibited by state law which required revisions to the SWMP to be approved by MDE

78.     MDE approved the City's and Baltimore County's SWMPs, relying on their representations that Wheelabrator Baltimore would be utilized as the City's primary method to safely and properly dispose of its waste, and be available for disposal of Baltimore County residential and commercial waste. The Baltimore Clean Air Act effectively rewrites the SWMPs by erasing Wheelabrator Baltimore, materially changing the conditions upon which MDE's approval relied. The Baltimore Clean Air Act imposes its own conflicting limits on waste acceptance with the intent of shutting the Facility down by amending the SWMPs legislatively.

## FIRST CAUSE OF ACTION

### Federal Clean Air Act Preemption

79.     Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-78 above.

80.     The Supremacy Clause of the Constitution, Art. VI, cl. 2, invalidates local laws which "interfere with or are contrary to the laws of Congress, made in pursuance of the Constitution."

81.     The CAA, first passed by Congress in 1970, comprehensively regulates air quality in the United States, including emissions from the operation of stationary sources such as waste-to-energy and HMIWI facilities. The Wheelabrator Baltimore Facility and Curtis Bay Facility are regulated under the CAA and have been since they commenced operations in 1985 and 1991, respectively.

82.     The 1990 amendments to the CAA imposed new and more stringent regulations on waste combustion units, under Sections 111(d) and 129. In 1995, EPA promulgated regulations under 40 C.F.R. § 60, subpart Cb to implement mandates for municipal waste combustors set forth in the 1990 amendments.

83.     In 1997, EPA promulgated regulations under 40 C.F.R. § 60, subpart Ce to implement mandates for HMIWI facilities set forth in the 1990 amendments.

84.     Nowhere does the CAA grant local governments the independent power to regulate air pollution or enact conflicting standards.

85.     EPA further tightened regulations for existing municipal solid waste combustors in May 2006 and for HMIWI facilities in 2013. These revisions included more stringent standards for metals and compounds that the Baltimore Clean Air Act attempts to regulate.

86.     At all times, the Wheelabrator Baltimore Facility and Curtis Bay Facility have been regulated by and have operated pursuant to CAA Title V permits under the ultimate authority of EPA.

87.     The requirements of the Baltimore Clean Air Act conflict with the specific emissions limits and operating regulations set by EPA.

88.     The Baltimore Clean Air Act prohibits activity which is expressly authorized by federal law, *i.e.*, operation of the Wheelabrator Baltimore Facility and Curtis Bay Facility pursuant to unambiguous requirements set by federal regulations and the Facilities' Title V permits.

89.     The Baltimore Clean Air Act stands as an obstacle to the accomplishment of the full purposes and objectives of federal law and interferes and conflicts with the methods by which the federal Clean Air Act regulations and Title V permit were designed to reach their goals.

90.     An actual controversy exists between Plaintiffs and Defendant regarding the legality and enforceability of the Act.

91.     As a direct and proximate result of the actions of the City of Baltimore, Plaintiffs will suffer direct, substantial, and irreparable injury for which there is no adequate remedy at law.

92.     Plaintiffs are entitled to a declaratory judgment that the CAA preempts the Baltimore Clean Air Act and to an injunction against Defendant prohibiting the City of Baltimore from enforcing the Act.

## SECOND CAUSE OF ACTION

### State Conflict Preemption – Maryland Air Laws

93.     Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-92 above.

94.     Maryland Constitution Art. XI-A, § 3 expressly provides that there shall be no conflict between the ordinances of the City of Baltimore and the public general laws of the State of Maryland: "All such local laws enacted by the Mayor of Baltimore and City Council of the City of Baltimore, shall be subject to the same rules of interpretation as those now applicable to the Public Local Laws of this State, except that in case of any conflict between said local law and any Public General Law now or hereafter enacted the Public General Law shall control."

95.     The Baltimore City Charter similarly provides that the City is empowered to "pass any ordinance, *not inconsistent with the provisions of the Charter or the laws of the State*." Baltimore City Charter Art. II, § 47 (emphasis added).

96.     The City of Baltimore's authority to pass an ordinance regulating air pollution control is circumscribed by the constitutional, charter, statutory, and common law limits on the

City's police power. Actions taken by Defendant outside of its legal authority or that are inconsistent with State laws are ultra vires and preempted.

97.     The Baltimore Clean Air Act conflicts with the Maryland air laws and their implementing regulations by prohibiting air emissions and monitoring methods that Maryland law permits and by further conflicting with the purpose of State law to promote science-based, uniform Maryland air pollution laws that are consistent with those adopted by EPA.

98.     The Baltimore Clean Air Act is inconsistent with and overrides the Maryland air laws by imposing a regulatory regime that countermands the Wheelabrator Baltimore and Curtis Bay Title V permits and abrogates established emissions limits and operational controls.

99.     The Act conflicts with the Title V permits issued to Wheelabrator Baltimore and Curtis Bay under the Clean Air Act and the Maryland air laws because the Baltimore Clean Air Act nullifies the specific emissions levels and CEMS requirements set forth in the Title V permits.

100.    An actual controversy exists between Plaintiffs and Defendant regarding the legality and enforceability of the Act.

101.    As a direct and proximate result of the actions of the City of Baltimore, Plaintiffs will suffer direct, substantial, and irreparable injury for which there is no adequate remedy at law.

102.    Accordingly, Plaintiffs seek a declaration that the Act conflicts with the Maryland air laws and is preempted, and seek an injunction barring its enforcement.

### THIRD CAUSE OF ACTION

### State Implied Preemption - Maryland Air Laws

103.    Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-102 above.

104.     The General Assembly established that "the Department [MDE] has jurisdiction over emissions and ambient air quality in th[e] State."  MD Code Ann., Envir. § 2-103(b). The law directed MDE to adopt regulations "for the control of air pollution in this State, including testing, monitoring, record keeping, and reporting requirements," taking into account all pertinent environmental and public health factors. Md. Code Ann., Envir. § 2-301.

105.     The Baltimore Clean Air Act is preempted by Maryland law under the doctrine of implied preemption. The Maryland air laws and implementing regulations occupy the field of regulation of air pollution, including emissions from Wheelabrator Baltimore's Facility and Curtis Bay's Facility. Maryland law has forcefully occupied this area through its SIP, adopting comprehensive air pollution regulations to regulate every aspect of air quality, leaving no room for local regulation in this complex area by the Act, which is impliedly preempted.

106.     The Baltimore Clean Air Act is impliedly preempted by the Title V permits issued to Wheelabrator Baltimore and Curtis Bay under the CAA and the Maryland air laws because the Title V permits comprehensively regulate the Facility, setting specific technical requirements for emissions levels and CEMS set forth in the Title V permits.

107.     The Baltimore Clean Air Act is impliedly preempted because allowing the Act and similar local regulations would engender chaos and confusion and would interfere with the purposes and objectives of the Maryland air laws, including goals of uniformity and prevention of balkanization of the complex field of air pollution control.

108.     An actual controversy exists between Plaintiffs and Defendant regarding the legality and enforceability of the Act.

109.     As a direct and proximate result of the actions of the City of Baltimore, Plaintiffs will suffer direct, substantial, and irreparable injury for which there is no adequate remedy at law.

110.    Accordingly, Plaintiffs seek a declaration that the Act is impliedly preempted by Maryland air law, and seek an injunction barring its enforcement.

## FOURTH CAUSE OF ACTION

### State Express Preemption – Maryland Air Laws

111.    Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-110 above.

112.    Express preemption occurs when the Maryland General Assembly prohibits local legislation in a field by specific language in a statute.

113.    The General Assembly established that "the Department [MDE] has jurisdiction over emissions and ambient air quality in th[e] State." MD Code Ann., Envir. § 2-103(b). The law directed MDE to adopt regulations "for the control of air pollution in this State, including testing, monitoring, record keeping, and reporting requirements," taking into account all pertinent environmental and public health factors. Md. Code Ann., Envir. § 2-301.

114.    Under Md. Code Ann., Envir. § 2-104, a state political subdivision's only option for seeking emission standards more stringent than the federal and state law, like the Baltimore Clean Air Act does, is to request MDE to adopt them through subsection 2-104(b).

115.    Subsection 2-104(b) directs that if a political subdivision desires the adoption of more stringent limits or standards it must ask MDE "to adopt rules and regulations that set more restrictive emission standards or ambient air quality standards in that subdivision."

116.    The City of Baltimore has followed this process set forth in Maryland law when it desired more stringent emissions limits by making a request to MDE, which the City has done as recently as 2017–18. Indeed, in late 2018, MDE issued a final rule under the SIP reducing the

Wheelabrator Baltimore Facility's limit for nitrogen oxides to the limit specifically requested by the City. COMAR 26.11.08.10.

117.    Section 2-104 contains no express or implied delegation of authority over air pollution control to local subdivisions, but simply recognizes residual police power authority over air quality. *See* Md. Code Ann., Envir. § 2-104(a).

118.    An actual controversy exists between Plaintiffs and Defendant regarding the legality and enforceability of the Act.

119.    As a direct and proximate result of the actions of the City of Baltimore, Plaintiffs will suffer direct, substantial, and irreparable injury for which there is no adequate remedy at law.

120.    Accordingly, Plaintiffs seek a declaration that the Act is expressly preempted by the Maryland air laws, and seek an injunction barring its enforcement.

## FIFTH CAUSE OF ACTION

### State Implied Preemption - Maryland Solid Waste Laws

121.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1-120 above.

122.    The Baltimore Clean Air Act is preempted by the Maryland Solid Waste Laws under the doctrine of implied preemption. These laws and implementing regulations largely occupy the field of solid waste management, including specifically waste disposed of at the Wheelabrator Baltimore Facility and Curtis Bay Facility. Maryland law has occupied this area (except zoning and other purely local issues) through its comprehensive statutes and regulations, and the specific requirement that municipalities, including Baltimore, create and maintain a SWMP that must be approved by MDE and may not be altered or amended without additional MDE review and approval.

123.    The Act is impliedly preempted by the RDP issued to Wheelabrator Baltimore and the RDP issued to Curtis Bay under the Maryland Solid Waste Laws because the permit comprehensively regulates the Facilities, setting specific requirements for the Facilities' operations, including the type and amount of waste that they can accept and pollution control measures. MDE's regulations thoroughly and pervasively cover the management of solid waste, which requires uniform, state-wide treatment.

124.    The Act is impliedly preempted because allowing the Act and similar local regulations would engender chaos and confusion and would interfere with the purposes and objectives of the Maryland Solid Waste Laws, which occupy the field of solid waste disposal except for a narrow set of purely local issues such as zoning.

125.    An actual controversy exists between Plaintiffs and Defendant regarding the legality and enforceability of the Act.

126.    As a direct and proximate result of the actions of the City of Baltimore, Plaintiffs will suffer direct, substantial, and irreparable injury for which there is no adequate remedy at law.

127.    Accordingly, Plaintiffs seek a declaration that the Act is impliedly preempted by Maryland solid waste law, and seek an injunction barring its enforcement.

## SIXTH CAUSE OF ACTION

### Ultra Vires

128.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1-127 above.

129.    The passage of an ordinance by the Baltimore City Council is an exercise of the City's police power under the Maryland Constitution and the Baltimore City Charter. Md. Const. Art. XI-A, § 3; Baltimore City Charter Art. II, § 47.

130.     By Maryland Constitution and City Charter, the City Council is limited to legislating local laws and may not legislate general laws. The Baltimore Clean Air Act is an impermissible general law that has far-reaching effects and damages outside of the City of Baltimore.

131.     Maryland Constitution Art. XI-A, § 3 expressly provides that there shall be no conflict between the ordinances of the City and the public general laws of the State: "All such local laws enacted by the Mayor of Baltimore and City Council of the City of Baltimore, shall be subject to the same rules of interpretation as those now applicable to the Public Local Laws of this State, except that in case of any conflict between said local law and any Public General Law now or hereafter enacted the Public General Law shall control."

132.     The Baltimore City Charter provides the same, stating that the City is empowered to "pass any ordinance, *not inconsistent with the provisions of the Charter or the laws of the State* . . . ." Baltimore City Charter Art. II, § 47 (emphasis added).

133.     The City of Baltimore's authority to pass an ordinance regulating air pollution control is circumscribed by the constitutional, charter, statutory, and common law limits on the City's police power. Actions taken by Defendant outside of its legal authority or that are inconsistent with State laws are ultra vires and void.

134.     The Maryland air laws expressly grant MDE authority to adopt regulations "for the control of air pollution in this State, including testing, monitoring, recordkeeping, and reporting requirements." *See* Md. Code Ann., Envir. § 2-301. The State has empowered MDE alone to adopt rules and regulations that set emission standards, and pursuant to the statute, Defendant may only impose different requirements by request to and approval from MDE.

135.     By imposing draconian and unsupported air pollution control restrictions on Wheelabrator Baltimore's waste-to-energy Facility and Curtis Bay's HMIWI Facility, the Baltimore Clean Air Act prohibits conduct that has been affirmatively authorized under State law and duly issued permits, contradicts and is an obstacle to MDE's authority to establish and set emission limits and monitoring requirements, and interferes with State goals for air pollution rules that are uniform and based on science-based standards and risk assessment.

136.     An actual controversy exists between Plaintiffs and Defendant regarding the legality and enforceability of the Act.

137.     As a direct and proximate result of the actions of the City of Baltimore, Plaintiffs will suffer direct, substantial, and irreparable injury for which there is no adequate remedy at law.

138.     Accordingly, Plaintiffs seek a declaration that the Act is ultra vires, and an injunction against enforcement of the Act in all respects.

## SEVENTH CAUSE OF ACTION

### Maryland Constitution, Article XI-A, Impermissible General Law

139.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1-138 above.

140.     Maryland Constitution Art. XI-A, § 3 provides that "[f]rom and after the adoption of a charter by the City of Baltimore . . . the Mayor of Baltimore and City Council of the City of Baltimore . . . subject to the Constitution and Public General Laws of this State, shall have full power to enact *local laws* of . . . said City . . . upon all matters covered by the express powers granted as above provided . . . ." (emphasis added).

141.     Likewise, the Baltimore City Charter provides that the City is empowered to "pass any ordinance, not inconsistent with the provisions of the Charter or the laws of the State . . . as

well as any ordinance as it may deem proper in maintaining the peace, good government, health and welfare of *Baltimore City*." Baltimore City Charter Art. II, § 47 (emphasis added).

142.    Article XI-A of the Maryland Constitution authorizes the City of Baltimore to enact only "local laws," and the Baltimore City Charter authorizes ordinances that maintain the health and welfare of "Baltimore City." The Baltimore Clean Air Act is not a "local law" within the meaning of Art. XI-A, and the Mayor of Baltimore and the City Council of Baltimore did not have the requisite authority to enact it, because it substantially affects the interests of people and entities outside of Baltimore. Specifically, the Act (i) dictates the nature and quality of air emissions and air quality far beyond the City's jurisdiction; (ii) imposes management controls on the combustion of solid waste from numerous sources outside of the City; and (iii) imposes environmental harms and costs by diverting solid waste to locations outside of the City. It is therefore facially unconstitutional under Article XI-A and impermissible under the City's Charter.

143.    A law is not a local law merely because its operation initially occurs in Baltimore if it affects the interests of people and businesses outside of the City. Here, the Mayor of Baltimore and the City Council of Baltimore have passed a general law – *i.e.*, a law which is of significant interest not just to any one city or county, but rather to more than one geographical subdivision – that is masquerading as a local law, an action wholly prohibited under the Maryland Constitution and the City's Charter.

144.    An actual controversy exists between Plaintiffs and Defendant regarding the legality and enforceability of the Act.

145.    As a direct and proximate result of the actions of the City of Baltimore, Plaintiffs and other affected persons and entities in Maryland will suffer direct, substantial, and irreparable injury for which there is no adequate remedy at law.

146.    Accordingly, Plaintiffs seek a declaration that the Act is unconstitutional under Article XI-A and impermissible per the terms of the Baltimore City Charter, and seek an injunction barring its enforcement.

## EIGHTH CAUSE OF ACTION

### Substantive Due Process – U.S. Constitution, 42 U.S.C. § 1983

147.    Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-146 above.

148.    The Fifth Amendment of the U.S. Constitution, made applicable to the states by the Fourteenth Amendment, provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law . . . ."

149.    The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides a civil action for an injured party against every person who, under color of law, deprives a person of rights, privileges, and immunities secured by the Constitution and laws of the United States.

150.    At all times, Defendant acted under color of State law.

151.    The Baltimore Clean Air Act and its terms are manifestly arbitrary, capricious, unjust, and unreasonable, constitute an abuse of legislative discretion, and fall outside the limits of legitimate governmental action.

152.    Defendant's actions in legislating the Baltimore Clean Air Act were not an exercise of reasoned judgment on proper air pollution control guided by legal standards and scientific facts. The illegal conditions in the Act contradict the findings, conclusions, and standards set by EPA and MDE. Defendant failed to conduct any study or provide any reasoned analysis or justification to support any of the limits and mandates imposed by the Act.

153.    As described above, the Baltimore Clean Air Act was promulgated without any legislative fact finding and with no relevant or supportable scientific and technical record. The unsupported Act stands in stark contrast to the vast scientific and technical work by EPA and MDE supporting their regulations and the Title V permits governing the Wheelabrator Baltimore Facility and the Curtis Bay Facility.

154.    By forcing a reduction in waste processing at the Wheelabrator Baltimore Facility and the Curtis Bay Facility through its draconian requirements, the Act will result in increased truck traffic on the roads in the City and the Baltimore Metropolitan region to transport waste to landfills, which in turn will cause increased vehicle emissions. The additional diverted waste will also increase regional greenhouse gas emissions from the landfills. There is no evidence in the record for the Act that its enactment will improve public health.

155.    The Act requires installation of monitoring technology that is not available for waste-to-energy facilities from any vendor, rendering compliance by the Wheelabrator Baltimore Facility impossible.

156.    The Act imposes extraordinary and unprecedented constraints specifically targeted at the Wheelabrator Baltimore Facility and the Curtis Bay Facility to cause their closure, regardless of the consequences to Baltimore residents, businesses, and the City's solid waste management.

157.    Wheelabrator Baltimore has a vested property interest in its Facility, which has operated since 1985, and in its Title V permit issued pursuant to federal and state law. The Act lacks a rational basis and deprives Plaintiff of those rights.

158.    Curtis Bay has a vested property interest in its Facility, which has operated since 1991, and its Title V permit issued pursuant to federal and state law. The Act lacks a rational basis and deprives Plaintiff of those rights.

159.     The actions of Defendant deprived Plaintiffs of their right to substantive due process of law in violation of the Fifth Amendment of the U.S. Constitution as applied to the states pursuant to the Fourteenth Amendment of the U.S. Constitution, in violation of 42 U.S.C. § 1983, and Plaintiffs are entitled to damages and attorneys' fees. Plaintiffs are damaged in an amount to be proven at trial.

160.     Accordingly, Plaintiffs seek a declaration that the Act violates substantive due process rights guaranteed by the U.S. Constitution, and an injunction against the enforcement of the challenged conditions.

## NINTH CAUSE OF ACTION

### Equal Protection – U.S. Constitution, 42 U.S.C. § 1983

161.     Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-160 above.

162.     The Baltimore Clean Air Act treats Wheelabrator Baltimore and Curtis Bay differently from similarly situated persons that generate air emissions in the City of Baltimore.

163.     The Act is not rationally related to a legitimate government purpose.

164.     The Act singles out Wheelabrator Baltimore and Curtis Bay for disparate treatment and is designed and intended to force the closure of the Facilities.

165.     The City of Baltimore's enactment of the Act violated each Plaintiff's right to equal protection of the laws as guaranteed by the United States Constitution, and the Plaintiffs are entitled to a declaratory judgment thereof and injunctive relief prohibiting Defendant from enforcing the Act.

166.     At all times, Defendant acted under color of State law.

167.     The City of Baltimore's enactment of the Act deprived the Plaintiffs of their rights to equal protection of the laws as guaranteed by the United States Constitution, in violation of 42 U.S.C. § 1983, and the Plaintiffs are entitled additionally to damages and attorneys' fees.

168.     As a direct and proximate result of Defendant's actions, the Plaintiffs have suffered and continue to suffer substantial damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### Maryland Declaration of Rights, Article 24

169.     Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-168 above.

170.     Article 24 of the Maryland Declaration of Rights protects against deprivation of property without due process and equal protection of law.

171.     The Baltimore Clean Air Act and its terms are manifestly arbitrary, capricious, or unreasonable, and an abuse of legislative discretion.

172.     Defendant's actions in legislating the Baltimore Clean Air Act were not an exercise of reasoned judgment regarding proper air pollution control or guided by legal standards and scientific facts. The illegal conditions in the Act contradict the findings, conclusions, and standards set by EPA and MDE. Defendant failed to conduct any study or provide any reasoned analysis to support any of the limits and mandates imposed by the Act.

173.     As described above, the Baltimore Clean Air Act was promulgated with no legislative fact finding and is not science-based. The almost non-existent record supporting the Act stands in stark contrast to the vast scientific and technical work by EPA and MDE supporting their regulations and Title V permits governing the Facilities.

174.    By forcing a reduction in waste processing at the Wheelabrator Baltimore Facility and the Curtis Bay Facility through its draconian requirements, the Act will result in increased truck traffic on the roads in the City and the Baltimore Metropolitan region to transport waste to landfills, which in turn will cause increased vehicle emissions. The additional wastes diverted to landfills will increase regional greenhouse gas emissions.

175.    Wheelabrator Baltimore has a vested property interest in its Facility, which has operated since 1985, and in its Title V permit issued pursuant to federal and state law. The Act lacks a rational basis and deprives Plaintiff of that right.

176.    Curtis Bay has a vested property interest in its Facility, which has operated since 1991, and in its Title V permit issued pursuant to federal and state law. The Act lacks a rational basis and deprives Plaintiff of that right.

177.    The Act treats the Facilities differently from similarly situated persons that generate air emissions in the City of Baltimore.

178.    The Act is not rationally related to a legitimate government purpose.

179.    The Act singles out the Wheelabrator Baltimore and Curtis Bay Facilities for disparate treatment and is designed and intended to force their closure.

180.    Accordingly, Plaintiffs seek a declaration that the Act violates due process and equal protection rights guaranteed by Article 24 of the Maryland Declaration of Rights, and an injunction against the enforcement of the Act.

## ELEVENTH CAUSE OF ACTION

### Maryland Declaration of Rights, Article 19

181.    Plaintiffs re-allege and incorporate each and every allegation set forth in Paragraphs 1-180 above.

182.     Article 19 of the Maryland Declaration of Rights ensures a remedy in the courts for injury to property.

183.     The Baltimore Clean Air Act has injured Wheelabrator Baltimore and Curtis Bay in their property by imposing an array of expensive requirements and standards that will be impossible to meet.

184.     The Act has injured Wheelabrator Baltimore in its property by countermanding the Facility's Title V permit and Wheelabrator Baltimore's reasonable reliance on established federal and state regulation of that Facility.

185.     The Act has injured Curtis Bay in its property by countermanding the Facility's Title V permit and Curtis Bay's reasonable reliance on established federal and state regulation of that Facility.

186.     By singling out Wheelabrator Baltimore and Curtis Bay to suffer onerous restrictions, Defendant has abused its police powers to target these Plaintiffs. The City of Baltimore's actions injure and continue to injure Plaintiffs, and the City has failed to provide Plaintiffs any remedy for their injuries.

187.     As a direct and proximate result of Defendant's actions, done under color of law, Plaintiffs have suffered substantial damages in an amount to be determined at trial. Damages continue to accrue.

188.     Accordingly, Plaintiffs seek a declaration that the Baltimore Clean Air Act violates Plaintiffs' rights to a remedy at law guaranteed by Article 19 of the Maryland Declaration of Rights, and an injunction against the enforcement of the Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

Pursuant to 28 U.S.C. § 2201, enter a declaratory judgment in Plaintiffs' favor declaring the Baltimore Clean Air Act to be unlawful, invalid, null, void, and preempted by federal and Maryland laws, ultra vires, arbitrary, unreasonable, and in violation of the Plaintiffs' rights under the United States and Maryland Constitutions;

Preliminarily and permanently enjoin Defendant, and anyone acting under the authority of or on behalf of Defendant, from enforcing or implementing the Baltimore Clean Air Act;

Award to Plaintiffs damages and its costs and fees under 42 U.S.C. § 1983, including attorney's fees; and

Grant such other and further relief as the Court deems just and proper.

Dated: April 30, 2019

Respectfully submitted,

/s/ *Roy D. Prather III*
James B. Slaughter (*to be admitted phv*)
David Friedland (*to be admitted phv*)
Joshua H. Van Eaton (*to be admitted phv*)
Meghan L. Morgan (*to be admitted phv*)
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W., Suite 700
Washington, DC 20005
(202) 789-6000 (Phone)
jslaughter@bdlaw.com
dfriedland@bdlaw.com
jvaneaton@bdlaw.com
meghan.morgan@bdlaw.com

Roy D. Prather, III (D.MD. ID no. 20157)
BEVERIDGE & DIAMOND, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201

(410) 230-1300 (Phone)
rprather@bdlaw.com

*Counsel for Plaintiffs Wheelabrator
Baltimore, L.P.; Energy Recovery Council;
National Waste & Recycling Association;
TMS Hauling, LLC*

/s/ *M. Trent Zivkovich*
M. Trent Zivkovich (D.MD. ID no. 28511)
WHITEFORD, TAYLOR &
PRESTON L.L.P.
7 Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700 (Phone)
tzivkovich@wtplaw.com

/s/ *Michael Powell*
Michael Powell, (D.MD. ID no. 09349)
George F. Ritchie, (D.MD. ID no. 22408)
GORDON FEINBLATT LLC
233 East Redwood St.
Baltimore, MD  21202
410-576-4000 (Phone)
mpowell@gfrlaw.com
gritchie@gfrlaw.com

*Counsel for Plaintiff Curtis Bay Energy,
L.P.*

(signed with permission from M. Trent
Zivkovich and Michael Powell)

## EXHIBITS

Exhibit A:      City Council Bill 18-0306, enacted and codified as Balt. City Health Code §8-110, *et seq*

Exhibit B:      Wheelabrator Baltimore's Title V permit

Exhibit C:      MDE Letter to EPA Submitting Maryland's SIP

Exhibit D:      Curtis Bay's Title V permit

Exhibit E:      Baltimore DPW Memorandum to Baltimore City Council, dated January 28, 2019

Exhibit F:      Baltimore DPW Fiscal Analysis of Possible Impacts of City Council Bill 18-0306, dated February 2019

Exhibit G:      Wheelabrator Baltimore's Refuse Disposal Permit (No. 2016-WTE-0030)

Exhibit H:      Curtis Bay's Refuse Disposal Permit (No. 2017-WMI-0036)