IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WHEELABRATOR                               :
BALTIMORE, L.P., et al.,
                                           :

    Plaintiffs,
                                           :        Civil Action No. GLR-19-1264
v.
                                           :

MAYOR AND CITY COUNCIL
OF BALTIMORE,                              :

    Defendant.                             :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Mayor and City Council of Baltimore's (the "City") Motion to Dismiss (ECF No. 30); Plaintiffs Wheelabrator Baltimore, L.P. ("Wheelabrator"), Curtis Bay Energy, L.P. ("Curtis Bay"), Energy Recovery Council ("ERC"), National Waste & Recycling Association ("NWRA"), and TMS Hauling, LLC's ("TMS") Motion for Partial Summary Judgment (ECF No. 35); and the City's Cross-Motion for Partial Summary Judgment (ECF No. 39).[1] The Motions are

---

[1] Also pending before the Court is a Motion for Leave to File Brief Amicus Curiae by the Local Government Coalition for Renewable Energy (ECF No. 36) and a Motion for Leave to File Brief Amicus Curiae of the Energy Justice Network (ECF No. 40).

There is no Federal Rule of Civil Procedure that applies to motions for leave to appear as amicus curiae in a federal district court. Am. Humanist Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n, 303 F.R.D. 266, 269 (D.Md. 2014). Accordingly, district courts have discretion to permit amicus briefs, and often look for guidance to Rule 29 of the Federal Rules of Appellate Procedure, which applies to amicus briefs at the federal appeals level. Id. Rule 29 indicates that amici should state "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed.R.App.P. 29(b)(2). Amicus briefs have been "allowed at the trial level where they provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance." Bryant v. Better Bus. Bureau of

ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant Plaintiffs' Partial Motion for Summary Judgment; deny the City's Partial Motion for Summary Judgment; and grant in part and deny in part the City's Motion to Dismiss.

## I.  BACKGROUND[2]

Plaintiffs Wheelabrator and Curtis Bay are solid waste incineration facilities located in Baltimore City, Maryland. (Compl. ¶¶ 8, 15, ECF No. 1). Wheelabrator receives non-hazardous municipal solid waste from homes and businesses in Baltimore City and surrounding counties and converts it into energy. (Id. ¶¶ 23, 26). Curtis Bay processes medical waste generated in Baltimore City and the surrounding counties to reduce the volume of waste entering landfills. (Id. ¶¶ 33–35). Because incineration produces emissions, Wheelabrator and Curtis Bay are subject to various federal and state air pollution laws and regulations. (Id. ¶¶ 31–32, 34).

Plaintiffs ERC and NWRA are non-profit trade associations that promote the interests of the waste-to-energy industry and for-profit waste companies. (Id. ¶¶ 18–19). Wheelabrator is a member of ERC and NWRA; Curtis Bay is a member of NWRA. (Id.).

---

Greater Md., Inc., 923 F.Supp. 720, 728 (D.Md. 1996) (citing Waste Mgmt. of Pa., Inc. v. City of York, 162 F.R.D. 34, 36 (M.D.Pa. 1995)).

Although the Local Government Coalition for Renewable Energy and the Energy Justice Network purport to have a special interest in this litigation, their proposed amici briefs do not provide any legal analysis beyond the arguments raised in the parties' briefs and are not necessary for the Court's determination of the legal issues at hand. Accordingly, the Court will deny the Motions.

[2] Unless otherwise noted, the Court takes the following facts from Plaintiffs' Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

Finally, Plaintiff TMS is a Baltimore City-based trash removal company that disposes waste from residential apartment buildings and small businesses within the City exclusively at the Wheelabrator facility. (Id. ¶ 17).

## A.    **Federal and State Regulatory Scheme**

The federal Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., is the primary mechanism for the management of air emissions in the United States. The CAA requires the Environmental Protection Agency ("EPA") to set acceptable levels of airborne emissions, called National Ambient Air Quality Standards ("NAAQS"), "the attainment and maintenance of which . . . are requisite to protect the public health." 42 U.S.C. § 7409(b)(1). As a result of this statutory directive, EPA has promulgated NAAQS for a number of air pollutants. See 40 C.F.R. § 50.4–50.9. To adopt or modify NAAQS, EPA must provide a public notice-and-comment period to permit "interested persons to submit written comments." 42 U.S.C. § 7409(a)(1)(B), (b)(1) & (2). EPA has also adopted extensive regulations concerning appropriate scientific equipment and techniques for measuring emissions levels and air quality. See 40 C.F.R. § 50, et seq.

Although EPA sets the nationwide level of acceptable emissions, it does not directly regulate the actual sources of emissions. See 42 U.S.C. § 7401(a)(3) (recognizing "that air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments"). Rather, decisions about the best way to achieve NAAQS are left to individual states. Id. § 7410(a)(1). As such, each state is required to prepare and submit to EPA a State Implementation Plan ("SIP") designed to achieve the NAAQS. Id. SIPs must "include enforceable emission limitations and other control measures, means, or

techniques" to guarantee compliance with NAAQS. Id. § 7410(a)(2)(A). SIPs must be approved by EPA before they become final. Id. § 7410(a)(1), (k)(2) & (3).

States are tasked with enforcing the limitations in their SIPs, which includes implementing a permit program to limit the amounts and types of emissions each permit holder is allowed to discharge. Id. §§ 7661a(d)(1), 7661c(a). Title V of the CAA requires solid waste incineration facilities to obtain an operating permit ("Title V permit") and certify compliance with all permit requirements on a regular basis. Id. § 7661a(a). Solid waste incineration facilities are prohibited from operating without a Title V permit. Id.

Title V permits are issued by the Maryland Department of the Environment ("MDE"). (Compl. ¶¶ 14, 16); see also 40 C.F.R. § 70.3; COMAR 26.11.03.01. Applicants for Title V permits must meet several requirements under Maryland's regulations. See COMAR 26.11.03.06. Proposed Title V permits must undergo a public notice-and-comment period, during which time members of the public may submit written comments. COMAR 26.11.03.07. Proposed Title V permits are also subject to review by any state purportedly affected by the permit and by the EPA. COMAR 26.11.03.08–09.

## B. **Wheelabrator's and Curtis Bay's Title V Permits**

As solid waste incinerators, Wheelabrator and Curtis Bay are subject to the State's Title V permitting system. See 42 U.S.C. § 7429. Wheelabrator's most recent Title V permit was issued by MDE on April 1, 2014. (Pls.' Mot. Partial Summ. J. ["Pls.' MSJ"] Ex. B ["Wheelabrator Title V Permit"] at 1, ECF No. 35-3). Wheelabrator's Title V permit authorizes emissions of nitrogen oxides up to 205 ppmvd; sulfur dioxide to 29 ppmv; dioxins and furans to 35 ng/dscm; and mercury to 50 µg/dscm. (Id. at 45–46). Curtis Bay's

most recent Title V permit, which was issued by MDE on May 1, 2019, authorizes emissions of nitrogen oxides up to 140 ppmvd; sulfur dioxide to 9 ppmv; dioxins and furans to 9.3 ng/dscm; and mercury to 18 µg/dscm. (Pls.' MSJ Ex. F ["Curtis Bay Title V Permit"] at 1, 31, ECF No. 35-7).

Under their Title V permits, Wheelabrator and Curtis Bay must employ Continuous Emissions Monitoring Systems ("CEMS") for particulate matter, sulfur dioxide, nitrogen oxides, carbon monoxide, hydrogen chloride, dioxins and furans, cadmium, lead, and mercury pursuant to the methods specified in 40 C.F.R. §§ 60.58b(b)–(i) and 40 C.F.R. §§ 60.56c(b)(6)–(13), respectively. (Wheelabrator Title V Permit at 45–46; Curtis Bay Title V Permit at 37). EPA must validate and approve any CEMS before it may be utilized by a solid waste incineration facility. See 42 U.S.C. § 7429(c); 40 C.F.R. § 60.13. Wheelabrator must impose CEMS for ninety-five percent of operational hours per calendar year; Curtis Bay must impose CEMS for ninety percent of its operating days per calendar quarter. See 40 C.F.R. § 60.38b, 60.58b, 60.37e(d), 60.57c(e); COMAR 26.11.08.08, 26.11.08.08-2B(5). Additionally, federal and state regulations permit downtime for repairs, calibration checks, and other adjustments on CEMS equipment. See 40 C.F.R. § 60.58b, 60.57c(e); COMAR 26.11.08.08, 26.11.08.08-2B(5).

Noncompliance with a Title V permit constitutes a violation of the CAA and Title 2 of the Environmental Article of the Annotated Code of Maryland, and may subject the permit holder to an enforcement action, permit revocation or revision, or denial of an application for permit renewal. (Wheelabrator Title V Permit at 22; Curtis Bay Title V

Permit at 20). The CAA imposes criminal penalties for "knowing" violations of the statute. 42 U.S.C. § 7413(c).

## C.  <u>Baltimore City Ordinance</u>

On February 11, 2019, the Baltimore City Council passed Ordinance 18-0306, known as the Baltimore Clean Air Act ("BCAA" or the "Ordinance"), Balt. City Health Code § 8-110, <u>et seq.</u>, which was signed into law on March 7, 2019. (Compl. ¶¶ 1, 4). The Ordinance applies to all commercial solid waste incinerators in Baltimore City, including Wheelabrator and Curtis Bay. (<u>Id.</u> ¶ 5; (Compl. Ex. A ["Ordinance"] § 8-112, ECF No. 1-2). The Ordinance limits permissible emissions of nitrogen oxides to 45 ppmvd; sulfur dioxide to 18 ppmv; dioxins and furans to 2.6 ng/dscm; and mercury to 15 µg/dscm. (Ordinance § 8-116). The Ordinance also requires CEMS for dioxins and furans; carbon dioxide and carbon monoxide; hydrochloric acid and hydrofluoric acid; nitrogen oxides; sulfur dioxides; particulate matter; volatile organic compounds; polycyclic aromatic hydrocarbons; and arsenic, cadmium, chromium, lead, manganese, mercury, nickel, selenium, and zinc. (<u>Id.</u> § 8-114). The Ordinance mandates that CEMS must be continuously active at all times the facility is operational and imposes penalties for lapses in CEMS exceeding thirty minutes. (<u>Id.</u> § 8-115). The Ordinance also establishes strict liability criminal penalties for violations. (<u>Id.</u> § 8-125).

## D.  <u>Procedural History</u>

On April 30, 2019, Plaintiffs sued the City, alleging: federal preemption (Count 1); state preemption (Counts 2–5); ultra vires (Count 6); violation of Article XI-A of the Maryland Constitution (Count 7); violations of substantive due process and equal

protection under 42 U.S.C. § 1983 (Counts 8 and 9); and violations of Articles 19 and 24 of the Maryland Declaration of Rights (Counts 10 and 11). (Compl. ¶¶ 79–188). Plaintiffs seek declaratory judgment, injunction against enforcement of the Ordinance, and monetary damages under § 1983. (Id. at 57).

On July 22, 2019, the City filed a Motion to Dismiss. (ECF No. 30). Plaintiffs filed an Opposition on August 16, 2019. (ECF No. 34). The City filed a Reply on September 20, 2019. (ECF No. 38). On August 23, 2019, Plaintiffs filed a Motion for Partial Summary Judgment. (ECF No. 35). The City filed its Opposition and Cross-Motion for Summary Judgment on October 15, 2019. (ECF No. 39). Plaintiffs filed their Reply in Support of Plaintiff's Motion and Opposition to the City's Cross-Motion for Partial Summary Judgment on October 31, 2019. (ECF No. 44). The City filed a Reply in Support of its Cross-Motion for Summary Judgment on November 14, 2019. (ECF No. 45).

## II.    DISCUSSION

### A.    Cross-Motions for Summary Judgment

#### 1.    Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers,

or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof,

"there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

When the parties have filed cross-motions for summary judgment, the Court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). The Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993). If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249–50.

### 2.    Analysis

#### a.    Genuine Dispute of Material Fact

As a preliminary matter, the Court must address whether there exists a genuine dispute of material fact precluding summary judgment. Although the City filed a Cross-Motion for Summary Judgment, it nonetheless contends that entering summary judgment in Plaintiffs' favor is inappropriate because there are "disputed facts and opinions that

require full discovery and a trial." (Def.'s Cross-Mot. Summ. J. & Opp'n Pls.' MSJ ["Def.'s MSJ"] at 3, ECF No. 39). The Court disagrees.

Plaintiffs move for summary judgment on only their preemption claims. A case that presents a pure question of law as to preemption should be resolved at the summary judgment stage. See AES Sparrows Point LNG, LLC v. Smith, 470 F.Supp.2d 586, 592 (D.Md. 2007) (citing Nat'l City Bank of Ind. v. Turnbaugh, 367 F.Supp.2d 805, 811 (D.Md. 2005), aff'd, 463 F.3d 325, 329 (4th Cir. 2006)). Resolution of Plaintiffs' preemption claims only requires the Court to compare federal and state statutes and regulations to the City's Ordinance. It does not require the Court to "delve into a complex array" of disputed facts, as the City suggests. (See Def.'s MSJ at 3).

The City also maintains that Plaintiffs' exhibits do not comport with Federal Rule of Civil Procedure 56(b). However, on summary judgment the Court may consider "otherwise inadmissible materials" so long as "it will be possible to put the information . . . into an admissible form." Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015). Overall, there is "great flexibility with regard to the evidence that may be used on a [summary judgment] proceeding." Id. Additionally, the Court may properly take judicial notice of matters of public record. See Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Because the exhibits on which the Court relies include legislative materials and state-issued permits, they are eligible for consideration at the summary judgment stage.

Finally, the City requests that the Court defer ruling on Plaintiffs' Motion for Partial Summary Judgment and enter a scheduling order to permit fact and expert discovery.

Federal Rule of Civil Procedure 56(d) provides that "[i]f a non-movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Despite this requirement, the City has not submitted an affidavit or declaration demonstrating that discovery is essential before ruling on Plaintiffs' Motion for Partial Summary Judgment. And in any event, the Court finds that no fact or expert discovery is needed to assess Plaintiffs' preemption arguments.

For these reasons, the Court finds that consideration of parties' cross-motions for summary judgment on Plaintiffs' preemption claims is appropriate at this time.

### b.    Preemption

Plaintiffs argue the BCAA is conflict preempted by Maryland law because the Ordinance prohibits solid waste incinerators from operating in the manner expressly authorized by the State's Title V permitting system.[3] For the reasons explained below, the Court agrees.

---

[3] "Under Maryland law, State law may preempt local law in one of three ways: (1) preemption by conflict, (2) express preemption, or (3) implied preemption." <u>Worton Creek Marina, LLC v. Claggett</u>, 850 A.2d 1169, 1176 (Md. 2004) (citation and quotations omitted). "Preemption analysis is disjunctive; the court need only find that one of the three preemption areas exists." <u>Perdue Farms Inc. v. Hadder</u>, 675 A.2d 577, 580 (Md.Ct.Spec.App. 1996). Because the Court finds that the BCAA is conflict preempted by state law, the Court need not address Plaintiffs' remaining state preemption arguments.

Relatedly, the Court need not address whether the BCAA is conflict preempted by the federal Clean Air Act. Although the text of the CAA makes clear that it does not prevent states or local governments from enacting standards that are more stringent than those contained in the federal laws and regulations, <u>see, e.g.</u>, 42 U.S.C. § 7416; <u>Union Elec. Co. v. Envtl. Protection Agency</u>, 515 F.2d 206 (8th Cir. 1975), <u>aff'd</u>, 427 U.S. 246 (1976), the

Preemption by conflict exists if a local ordinance "prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." Talbot Cty. v. Skipper, 620 A.2d 880, 883 n.4 (1993) (citing Boulden v. Mayor, 535 A.2d 477 (Md. 1988)). However, a local ordinance may also conflict with a state law even where it "[does] not specifically permit or prohibit an act permitted or prohibited by the state." See Worton Creek Marina, LLC v. Claggett, 850 A.2d 1169, 1177 (Md. 2004). For instance, a local law may be conflict preempted by state law where the local law "seeks to second guess" the state's expertise in an area regulated by the state. See Montgomery Cty. Bd. of Realtors v. Montgomery Cty., 411 A.2d 97, 102 (Md. 1980) (invalidating a local tax on the variance between the assessed value of real estate and the actual sale price of the real estate because it conflicted with the state's scheme for assessment of real property).

Here, the Ordinance conflicts with state law by prohibiting—and, in some cases, criminalizing—conduct that is permitted under the facilities' existing Title V permits. See Skipper, 620 A.2d at 883 n.4. While the facilities' Title V permits allow them to emit certain levels of nitrogen oxides, sulfur dioxides, and mercury, the Ordinance sets significantly stricter caps on those pollutants. (Compare Wheelabrator Title V Permit at

---

savings clause does not act as an affirmative grant of power to local governments, R.I. Cogeneration Assocs. v. City of E. Providence, 728 F.Supp. 828, 833 n.11 (D.R.I. 1990). Rather, because local governments are subordinate to the states, any grant of authority must come from state legislatures, not from Congress. Id. In other words, if the State has preempted the BCAA, its validity cannot be saved by a grant of authority from Congress. See id. Because the Court finds that the BCAA is preempted by Maryland law, the Court does not need to examine whether it is preempted by the CAA.

45–46 <u>and</u> Curtis Bay Title V Permit at 37 <u>with</u> Ordinance § 8-116). The Ordinance also requires CEMS for pollutants that are not required to be monitored under the existing Title V permits, including carbon dioxide, hydrochloric acid, volatile organic compounds, polycyclic aromatic hydrocarbons, arsenic, chromium, manganese, nickel, selenium, and zinc. (<u>Compare</u> Wheelabrator Title V Permit at 45–46 <u>and</u> Curtis Bay Title V Permit at 37 <u>with</u> Ordinance § 8-114). Additionally, the Ordinance requires CEMS monitoring at all times the facilities are operational and imposes sanctions for monitoring gaps of more than thirty minutes, despite federal and state laws allowing downtime for repairs, calibration checks, and adjustments to the monitoring systems. (<u>Compare</u> Ordinance § 8-115 <u>with</u> 40 C.F.R. § 60.58b, 60.57c(e); COMAR 26.11.08.08, 26.11.08.08-2B(5)). Unlike the penalties established by the CAA and Title V permitting system, the Ordinance imposes strict liability penalties, thereby making some of the conduct allowed by the Title V permits unlawful. (<u>See</u> Ordinance § 8-125). Put simply, the Ordinance is conflict preempted because it virtually invalidates the facilities' state-issued Title V permits.

Further, the BCAA is conflict preempted because it "second guesses" the complex federal and state regulatory scheme for air emissions. <u>See</u> <u>Montgomery Cty. Bd. of Realtors</u>, 411 A.2d at 102. Sulfur dioxides, nitrogen oxides, and mercury are among the air pollutants extensively regulated by the CAA and, by extension, individual states. Emissions standards for these pollutants are set by EPA after a lengthy public rulemaking process and enforced through intricate permitting systems administered by the states. Indeed, each Title V permit is intended to be "a source-specific bible for Clean Air Act compliance" containing "in a single, comprehensive set of documents, all CAA

requirements relevant to the particular polluting source." <u>Virginia v. Browner</u>, 80 F.3d 869, 873 (4th Cir. 1996). Allowing a locality to undermine this regulatory scheme by substituting its judgment in place of decisions by the federal and state government is not consistent with the goals of the CAA and its corresponding state statutes.

For its part, the City argues that the Ordinance cannot be conflict preempted because the Maryland air pollution statute contains a "savings clause," which provides that the statute "does not limit the power of a political subdivision to adopt ordinances, rules, or regulations that set emission standards or ambient air quality standards" so long as the standards are not "less stringent than the standards set by the Department under this title." Md. Code Ann., Envir. § 2-104 (a)(1)–(2). Importantly, however, the inclusion of a savings clause does not necessarily preclude a finding of conflict preemption. <u>See, e.g.</u>, <u>North Carolina ex rel. Cooper v. Tenn. Valley Auth.</u>, 615 F.3d 291 (4th Cir. 2010) (finding that the CAA preempted a public nuisance lawsuit by North Carolina in spite of the Act's savings clause because the lawsuit was a collateral attack against the emission standards established by the federal government); <u>Clean Air Mkts. Grp. v. Pataki</u>, 338 F.3d 82, 86–87 (2d. Cir. 2003) (holding that a New York law limiting sales of emission allowances to upwind states was preempted by Title IV of the CAA because the state law was in "actual conflict" with Congress' method of controlling sulfur dioxide emissions); <u>see also</u> <u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861, 870 (2000) (concluding that the National Traffic and Motor Vehicle Safety Act's saving clause did not foreclose or limit operation of ordinary conflict preemption principles). Indeed, a court may find that a law is conflict preempted even where it purports to fit within a statute's savings clause. <u>See</u>  <u>United States v. Locke</u>,

529 U.S. 89, 106, (2000) ("We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.").[4]

The City also contends that the Ordinance does not conflict with the State's air pollution laws because it imposes more stringent emissions standards. Once again, this argument fails. A local law may conflict with a state law even where the local law purports to strengthen the state standard. For instance, in Perdue Farms Inc. v. Hadder, 675 A.2d 577 (Md.Ct.Spec.App. 1996), the court invalidated a local ordinance imposing a stricter nitrogen limit on irrigation spray because the ordinance "impermissibly second guess[ed] MDE on the question of how best to achieve compliance with a standard contained in MDE's water quality regulations." Id. at 580. Though both the local and state regulations aimed to achieve safe drinking water standards, the court recognized the local ordinance would make spray irrigation more costly, thereby "abdicating the State's goal of encouraging spray irrigation over [another type of irrigation]." Id. As a result, the local ordinance was "patently in conflict with the State approach." Id.

Here, MDE is required to set emissions standards "based on the goal of achieving emission levels that are not more restrictive than necessary to attain and maintain the ambient air quality standards" established by the federal government. Envir. § 2-302(d)(1). By imposing emissions standards, monitoring requirements, and criminal penalties that are

---

[4] Moreover, the savings clause in the state statute merely allows political subdivisions to "set emission standards or ambient air quality standards." Envir. § 2-104 (a)(1). It does not authorize localities to impose additional monitoring requirements or criminal penalties, as the Ordinance does here. Thus, even if the savings clause insulated the Ordinance's emissions limits from preemption analysis, the Court would nonetheless analyze whether other sections of the Ordinance are conflict preempted.

significantly stronger than those mandated by the state, the BCAA undermines MDE's authority to decide the best way to achieve compliance with NAAQS. Moreover, because the BCAA will make operation of Wheelabrator and Curtis Bay more costly, the BCAA upsets the state's goal of setting standards that are not more restrictive than necessary to achieve the NAAQS.[5]

In sum, the Court finds that the BCAA is conflict preempted by Maryland's air pollution laws. Because the Court will enter judgment in favor of Plaintiffs on Counts 1 through 5, the Court will deny the City's Motion to Dismiss as to those Counts. The Court will next address whether Counts 6 through 11 survive the City's Motion to Dismiss.

## B. **Motion to Dismiss**

### 1. **Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible

---

[5] The City admits that "[t]here may be a cost to Wheelabrator and Curtis Bay in meeting [the BCAA's] stricter standards," but disputes what that cost might be. (Def.'s MSJ at 9). Additionally, evidence in the record suggests that stricter emissions limits on nitrogen oxide would result in only "a small increase in operating costs" to Wheelabrator and Curtis Bay. (Def.'s MSJ Ex. C-1 ["MDE Technical Supp. Doc.] at 8, ECF No. 39-3). Determining the precise cost is irrelevant to the Court's preemption analysis, however, because it is undisputed that the BCAA would impose at least some additional cost on Wheelabrator and Curtis Bay.

on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of Am., NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

In reviewing a Rule 12(b)(6) dismissal, the Court may properly take judicial notice of matters of public record. See Philips, 572 F.3d at 180; Hall v. Virginia, 385 F.3d 421, 424 (4th Cir. 2004). The Court may also consider documents attached to the complaint, see Fed.R.Civ.P. 10(c), as well as those attached to the motion to dismiss, so long as they are

integral to the complaint and authentic, see <u>Blankenship v. Manchin</u>, 471 F.3d 523, 526 n.1 (4th Cir. 2006).

### 2. Analysis

#### a. Ultra Vires & Violation of Article XI-A of the Maryland Constitution (Counts 6 & 7)

Plaintiffs contend that the BCAA is ultra vires and violates Article XI-A of the Maryland Constitution because the Ordinance is a general law that impermissibly regulates conduct outside of Baltimore City. The Court disagrees.

Under Article XI-A, "the Mayor of Baltimore and City Council of the City of Baltimore . . . subject to the Constitution and Public General Laws of this State, shall have full power to enact <u>local laws</u> of . . . said City . . . upon all matters covered by the express powers granted as above provided[.]" Md. Const., art. XI-A, § 3 (emphasis added). A law is not "local" if it applies to "two or more of the geographical sub-divisions of this State[.]" <u>Id.</u> § 4. Even where a law has some effect outside of local borders, it is nonetheless a local law so long as it is "essentially limited to the territorial boundaries of the enacting jurisdiction." <u>See</u> <u>Holiday Universal, Inc. v. Montgomery Cty.</u>, 833 A.2d 518, 524 (Md. 2003); <u>see also</u> <u>Tyma v. Montgomery Cty.</u>, 801 A.2d 148, 150 (Md. 2002) (upholding a county ordinance granting benefits to domestic partners of county employees, some of whom resided outside the county); <u>Steimel v. Bd. of Election Sup'rs of Prince George's Cty.</u>, 357 A.2d 386, 388 (Md. 1976) (finding a law permitting county businesses to remain open on Sundays was a local law because it was "confined in its operation to prescribed territorial limits"). Additionally, a locality may properly regulate activities occurring

within its boundaries by a business with a significant presence therein. See Bourgeois v. Live Nation Entm't, Inc., 3 F.Supp.3d 423, 446 (D.Md. 2014) (permitting local regulation of Ticketmaster transactions). However, a law is not local where it has a "substantial territorial effect beyond" the jurisdiction. Holiday, 833 A.2d at 525 (overturning a municipal law regulating service contracts because "the ordinance makes clear that it would apply to a contract signed outside of [the county], by parties residing outside of [the county]").

Here, the plain language of the BCAA makes clear that it applies only to "commercial solid waste incinerators located within Baltimore City." (Ordinance § 8-112). Thus, the Ordinance is confined to a specific territorial limit and regulates businesses that operate therein. Moreover, Plaintiffs' allegations that the BCAA imposes controls on solid waste coming from sources outside the City and requires the diversion of solid waste to locations outside the City are not sufficient to show that the BCAA has a substantial effect beyond the jurisdiction. Rather, local laws are permitted to have some extra-territorial effect. See Tyma, 801 A.2d at 150. Accordingly, Counts 6 and 7 will be dismissed.

### c.     Equal Protection Claims (Counts 9 and 10)[6]

The City argues for dismissal of Plaintiffs' equal protection claims under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights because Plaintiffs have failed to overcome the presumption that the BCAA is rational. Plaintiffs respond that they have

---

[6] Maryland courts interpret Article 24 of the Maryland Declaration of Rights in pari materia with the Equal Protection clause of the U.S. Constitution. Accordingly, the Court will analyze these claims together. See Murphy v. Edmonds, 601 A.2d 102, 108 (Md. 1992).

sufficiently challenged the Ordinance's rationality by alleging that it is unsupported by scientific or technical data and is specifically designed to force Wheelabrator and Curtis Bay to close. At bottom, the Court agrees with the City.

The Ordinance at issue here involves no fundamental right and is thus subject to rational basis review.[7] Under the rational basis standard, legislative action is afforded a "strong presumption of validity" and will be upheld if it is "rationally related to legitimate governmental goals." Wilkins v. Gaddy, 734 F.3d 344, 347–48 (4th Cir. 2013). Legislatures are not required to identify or explain the rationale underlying their statutory decisions. F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993); see also Maages Auditorium v. Prince George's Cty., 4 F.Supp.3d 752, 776 (D.Md. 2014) (reiterating that the legislature need not "introduce evidence or prove the actual motivation" behind the challenged statute or regulation). "[I]n an Equal Protection challenge under rational basis review, the government need only demonstrate there is some legitimate justification [for the legislative act]." Maages Auditorium, 4 F.Supp.3d at 776. Thus, legislative action may be upheld even where it is based on "rational speculation unsupported by evidence or empirical data." Beach Commc'ns, 508 U.S. at 315.

The "rational basis" standard of review is unquestionably deferential. Gaddy, 734 F.3d at 347. Thus, "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." Giarratano v. Johnson, 521 F.3d 298, 304 (4th Cir. 2008).

---

[7] Fundamental rights include those relating to voting, privacy, freedom of association, and access to the courts. Vill. of Belle Terre v. Boraas, 416 U.S. 1, 7 (1974).

Further, a party challenging legislative action bears the burden of negating "every conceivable basis which might support it." Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973) (citation omitted).

The stated purpose of the BCAA is "to ensure that accurate and complete information is available to the City and general public about pollutants released from commercial solid waste incinerators within the City and to exercise the authority granted to the City under the Maryland Environment Code." Ordinance § 8-110. In furtherance of that goal, the BCAA establishes "emission limits on nitrogen oxides, sulphur dioxide, and other pollutants that are more stringent than the limits established by state and federal law." (Id.). Based on this stated goal and the BCAA's provisions, which are clearly aimed at reducing air pollution, the Court concludes that the BCAA is rationally related to a legitimate governmental goal. Accordingly, the onus is on Plaintiffs to negate every conceivable basis supporting the BCAA.

Plaintiffs assert that the BCAA "singles out Wheelabrator Baltimore and Curtis Bay for disparate treatment and is designed and intended to force the[ir] closure," (Compl. ¶ 164), thereby violating their right to equal protection under the law. Unsubstantiated allegations that legislative action is motivated by animosity fall short of stating an equal protection claim. See, e.g., Vill. of Belle Terre v. Boraas, 416 U.S. 1, 8–9 (1974) (upholding a housing ordinance that residents characterized as reeking of animosity toward unmarried people where there was no evidentiary support for that allegation). The Court concludes that Plaintiffs have failed to state a § 1983 claim for violation of the Equal Protection Clause. Thus, Counts 9 and 10 must be dismissed.

### d. Substantive Due Process (Count 8)

To make out a claim that the City's Ordinance violated the Substantive Due Process clause, Plaintiffs must demonstrate: (1) that they had property or a property interest; (2) that the City deprived them of this property or property interest; and (3) that the City's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency. See Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995) ("Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement them.") (internal quotations omitted).

The protection of substantive due process is indeed narrow and covers only government action which is "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." Rucker v. Harford Cty., 946 F.2d 278, 281 (4th Cir. 1991), cert. denied, 502 U.S. 1097 (1992). And in the context of a decisions concerning land use, it must be clear that the government's action "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense." Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 827 (4th Cir. 1995) (quoting Nectow v. Cambridge, 277 U.S. 183, 187–88 (1928) (internal quotations omitted)).

The thrust of Plaintiffs' Substantive Due Process claim is that the BCAA is an "arbitrary, capricious, unjust, and unreasonable" abuse of legislative discretion because the

City failed to exercise "reasoned judgment on proper air pollution control[,] guided by legal standards and scientific facts." (Compl. ¶¶ 151–52). Plaintiffs further allege that the City has not "provide[d] any reasoned analysis or justification" for the BCAA's enactment. (Id. ¶ 152). However, Plaintiffs themselves note that the BCAA regulates pollutants that are already strictly regulated under state and federal law, consistent with EPA's "public policy goal of reducing emissions." (Compl. ¶¶ 54, 57). Given these allegations, Plaintiffs cannot show the BCAA is utterly "arbitrary and irrational" or "unjustified by any circumstance or governmental interest." See Rucker, 946 F.2d at 281. As such, Plaintiffs have failed to state a Substantive Due Process claim, and Count 8 must be dismissed.

### e.    Article 19 Claims (Count 11)

Article 19 states that every person who suffers either personal or property damage "ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay." Md. Const. Decl. of Rights, art. 19. Article 19 guarantees an opportunity to seek judicial redress of a wrong. Dehn Motor Sales, LLC v. Schultz, 96 A.3d 221, 237 (Md. 2014).

Plaintiffs have failed to identify how the City has denied them the opportunity to seek judicial redress of a wrong. Indeed, Plaintiffs are doing exactly that by filing suit in this Court. Additionally, because Plaintiffs' Article 19 claim "simply seek[s] declaratory and injunctive relief that the Ordinance is illegal for the reasons set forth in the other ten counts of the Complaint," (Pls.' Mem. Opp'n Def.'s Mot. Dismiss ["Opp'n to MTD"] at 35, ECF No. 34), the claim is redundant and does not stand on its own. As such, Count 11 will be dismissed.

### f. TMS Hauling

The City argues that although Plaintiff TMS purports to be a limited liability company, TMS forfeited its charter by failing to pay taxes and is therefore unable to serve as a Plaintiff. In their Opposition, Plaintiffs made no attempt to dispute this allegation. In failing to respond to this allegation, the Court concludes that Plaintiffs concede this point. See Muhammad v. Maryland, No. ELH-11-3761, 2012 WL 987309, at *1 n.3 (D.Md. Mar. 20, 2012) ("[B]y failing to respond to an argument made in a motion to dismiss, a plaintiff abandons his or her claim."). Accordingly, the Court concludes that TMS is ineligible to participate in this litigation and must be terminated as a named Plaintiff.

## III.    CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Partial Motion for Summary Judgment (ECF No. 35); deny the City's Partial Motion for Summary Judgment (ECF No. 39); grant in part and deny in part the City's Motion to Dismiss (ECF No. 30); and deny the Motions for Leave to File Amicus Curiae Briefs by the Local Government Coalition for Renewable Energy and Energy Justice Network (ECF Nos. 36, 40). A separate Order follows.

Entered this 27th day of March, 2020.

_____/s/_____
George L. Russell, III
United States District Judge